**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**BRADFORD J. SURLOCK,** *individually and as next friend of Michael Surlock*, **and MARY-ANNE SURLOCK,** *individually and as next friend of Michael Surlock,*

                              **Plaintiffs,**

          **vs.**                                    **5:11-cv-1121**
                                                     **(MAD/DEP)**

**KERRY DELANEY,** *Acting Commissioner of the New York State Office For People With Developmental Disabilities*; **JOHN GLEASON,** *Director, Central New York DDSO*; **LYNETTE O'BRIEN,** *Deputy Director, Central New York DDSO*; **ANTHONY DINUZZO,** *Deputy Director of Quality Assurance, Central New York DDSO*; **LAURIE ELLIOTT,** *Treatment Team Leader, Central New York DDSO, Fulton Office*; **BARBARA ALEXANDER,** *Development Assistant III, Central New York DDSO, Fulton Office*; **RON REID,** *House Director, Fravor Road IRA*; **VICTORIA LEBOEUF,** *Former House Director, Fravor Road IRA*; **AMY HILLARD,** *Assistant House Director, Fravor Road IRA*; **FELICIA GRAHAM,** *Former Assistant House Director, Fravor Road IRA*; **RAY PERKINS,** *Former Assistant House Director, Fravor Road IRA*; **MONIQUE DICKERSON,** *Fravor Road IRA Nurse*; **DONNA MOTYKA,** *Former Fravor Road IRA Nurse*; **DENISE REYNOLDS,** *Former Fravor Road IRA Nurse*; **CORA SPENCER,** *Fravor Road IRA Direct Care Staff*; **TRACEY JASIEWICZ,** *Former Assistant House Director, Fravor Road IRA*; **JEANETTE MAYNES,** *Fravor Road IRA Direct Care Staff*; **and DIANE FINSTER,** *Fravor Road IRA Direct Care Staff*,

                              **Defendants.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**OFFICE OF GUSTAVE J. DIBIANCO**          **GUSTAVE J. DIBIANCO, ESQ.**
62 Cherry Tree Circle
Liverpool, New York 13090
Attorneys for Plaintiffs

**SUSSMAN & WATKINS**                      **MICHAEL H. SUSSMAN, ESQ.**
55 Main Street, Suite 6
P.O. Box 1005
Goshen, New York 10924
Attorneys for Plaintiffs

**OFFICE OF WILLIAM J. PORTA**             **WILLIAM J. PORTA, ESQ.**
42 Maple Avenue
Hamilton, New York 13346
Attorneys for Plaintiffs

**SMITH, SOVIK, KENDRICK &**               **MICHAEL P. RINGWOOD, ESQ.**
**SUGNET, P.C.**                           **JOHN P. COGHLAN, ESQ.**
250 South Clinton Street                   **KAREN G. FELTER, ESQ.**
Suite 600
Syracuse, New York 13202-1252
Attorneys for Defendants Delaney,
Gleason, O'Brien, and DiNuzzo

**GOLDBERG SEGALLA**                       **KENNETH M. ALWEIS, ESQ.**
5786 Widewaters Parkway                    **HEATHER K. ZIMMERMAN, ESQ.**
Syracuse, New York 13214                   **LISA MARIE ROBINSON, ESQ.**
Attorneys for Defendants Elliott,          **MOLLY M. RYAN, ESQ.**
Alexander, Reid, LeBoeuf,
Perkins and Jasiewicz

**OFFICE OF LESLIE R. LEWIS**              **LESLIE R. LEWIS, ESQ.**
23 Genesee Street
New Hartford, New York 13413
Attorneys for Defendant Hillard

**CARROLL & CARROLL, P.C.**                **WOODRUFF LEE CARROLL, ESQ.**
Galleries of Syracuse, 2nd Floor
441 South Salina Street
Syracuse, New York 13202-0352
Attorneys for Defendant Graham

**GALE, GALE & HUNT, LLC**                 **CATHERINE A. GALE, ESQ.**

P.O. Box 6527                                MATTHEW J. VAN BEVEREN, ESQ.
Syracuse, New York 13217
Attorneys for Defendants Dickerson,
Motyka, and Reynolds

**MACKENZIE HUGHES LLP**          **JENNIFER PLOETZ WILLIAMS, ESQ.**
101 South Salina Street              **MARK R. SCHLEGEL, ESQ.**
P.O. Box 4967
Syracuse, New York 13221-4967
Attorneys for Defendant Spencer

**AMDURSKY, PELKY, FENNELL &**    **TIMOTHY J. FENNELL, ESQ.**
**WALLEN, P.C.**
26 East Oneida Street
Oswego, New York 13126
Attorneys for Defendant Maynes

**SATTER LAW FIRM, PLLC**          **MIMI C. SATTER, ESQ.**
217 South Salina Street              **SARAH E. RUHLEN, ESQ.**
6th Floor
Syracuse, New York 13202
Attorneys for Defendant Finster

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Michael Surlock ("Michael") and his parents Bradford and Mary-Anne Surlock commenced this action on September 21, 2011, asserting claims for constitutional violations pursuant to 42 U.S.C. § 1983, claims under Title II of the Americans with Disabilities Act ("ADA"), and claims under New York State common law. *See* Dkt. No. 1. Thereafter, Plaintiffs amended the complaint and Judge Mordue granted in part and denied in part Defendants' joint motion to dismiss the amended complaint. *See* Dkt. No. 106.[1]

---

[1] Defendants were originally all represented by the New York State Attorney General's Office.

On September 30, 2015, through seven separate motions, sixteen of the eighteen Defendants moved for summary judgment on Plaintiffs' claims.[2]  In their joint response, Plaintiffs withdraw the following claims: (1) all claims against Defendant Jasiewicz; (2) the First Amendment claims against Defendants Graham, Dickerson, Reynolds, Motyka, Maynes, and Finster; (3) the intimate association claim against all Defendants; and (4) the procedural due process claim against Defendants LeBoeuf, Reid, Perkins, and Graham.  *See* Dkt. No. 371 at 11.[3]  As such, in their response Plaintiffs defend the following claims: (1) the substantive due process claims against Defendants Gleason, O'Brien, DiNuzzo, Elliott, Alexander, Reid, LeBoeuf, Perkins, Graham, Dickerson, Reynolds, Motyka, Spencer, Maynes, and Finster; (2) the First Amendment claims against Defendants Gleason, O'Brien, DiNuzzo, Elliott, Alexander, Reid, LeBoeuf, Perkins, and Spencer; (3) the procedural due process claims against Defendants Gleason, O'Brien, DiNuzzo, Elliott, and Alexander; (4) the negligent supervision claims against Defendants Gleason, O'Brien, DiNuzzo, Elliott, Alexander, Reid, LeBoeuf, Perkins, and Graham; and (5) the medical malpractice claims against Defendants Dickerson, Reynolds, and Motyka. *See id.*[4]

---

[2] Despite her counsel having appeared in this matter and having filed an answer, Defendant Hillard did not move for summary judgment.  Moreover, while Defendant Delaney's counsel filed a motion on behalf of Defendants Gleason, O'Brien and DiNuzzo, that group's notice of motion does not specify that it is seeking any relief on behalf of Defendant Delaney and their memorandum of law does not make any argument specifically on Defendant Delaney's behalf.

[3] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[4] Plaintiffs also note that they "continue all of their Section 1983 claims for prospective injunctive relief against Kerry Delaney in her official capacity as [Office for People with Developmental Disabilities] Commissioner and all claims they have asserted against Amy Hillyard [sic], both of whom . . . have not moved for summary judgment."  Dkt. No. 371 at 11,

(continued...)

Currently before the Court are Defendants' motions for summary judgment.

## II. BACKGROUND

**A.      The parties**

Michael Surlock is a profoundly disabled young man who resides in the care and custody of the State of New York.  *See* Dkt. No. 371 at 9.  He has a severe form of autism and an intelligence quotient in the range of profound to severe mental retardation.  *See id.*  Michael is non-verbal, cannot perform most basic life-sustaining tasks on his own, engages in self-injurious behavior ("SIB") and requires constant, around-the-clock supervision just to survive.  *See id.* Michael also suffers from epilepsy and osteoporosis.  *See id.* at 12.  In October of 2007, it became evident that Michael (then twenty five) required full-time care in a residential facility, so his parents, Plaintiffs Bradford and Mary-Anne Surlock, placed him in the care and custody of the New York State Office for People with Developmental Disabilities ("OPWDD" or the "agency"). *See id.*  The agency placed him at Fravor Road Individual Residential Alternative ("IRA"), a facility it owned and operated in Mexico, New York.  *See id.*  Michael's care at Fravor Road was governed by multiple Skill Acquisition Plans ("SAPs"), Residential Habilitation Plans ("RHPs"), Individual Plans of Protective Oversight ("IPPOs"), and Behavior Plans.  *See* Dkt. No. 390-1 at ¶ 9.  Michael lived at Fravor Road until December 18, 2012, when the agency moved him to the Central Square IRA in Central Square, New York.  *See* Dkt. No. 371 at 12.

According to Michael's behavior plan, "Michael displays unusual flexibility and strength, particularly when escalated.  It is difficult for anyone to safely intervene and/or protect

[4](...continued)
n.5.

themselves or Michael from injury. Recent records indicate injuries to Michael (e.g. bruising, sutures, broken teeth), injuries to staff working with Michael (e.g. broken teeth, concussions, neck/back injuries), and some instances of property damage[.]" Dkt. No. 375-39 at 1. Moreover, the behavior plan dated August 27, 2010 noted the following in regards to his progress:

> When first admitted to [Fravor Road], Michael averaged approximately 11 episodes of self injurious behavior (slapping/scratching his face, banging head/limbs) a day at the residence alone. He also engaged in episodes of "floor sprawling" an average of approximately 5 times per day. According to current data, . . . Michael continues to exhibit "floor sprawling" at an average rate of 2 to 3 times per day; with a similar rate for episodes of SIB. Due to the severity of these behaviors when they occur, the risk of serious injury remains unacceptably high.

*Id.* at 6.

OPWDD is a cabinet level agency of the State of New York. *See* Dkt. No. 390-1 at ¶ 1. OPWDD provides services for New Yorkers with developmental disabilities, including intellectual disabilities, autism spectrum disorders, and other neurological impairments. *See id.* at ¶ 2. OPWDD provides services at sites throughout New York State, including facilities offering long-term residential support. *See id.* at ¶ 3. OPWDD operates IRA facilities where individuals with disabilities reside under the care of OPWDD staff. *See id.* at ¶ 4. One such IRA is located at Fravor Road in Mexico, New York. *See id.* OPWDD provides services directly and through a network of approximately 750 nonprofit service providing agencies, with about 80 percent of services provided by the private nonprofits and 20 percent provided by state-run services. *See* Dkt. No. 377-1 at ¶ 7.

6

Defendant Diane Finster began working for OPWDD at Fravor Road on August 12, 2010. *See* Dkt. No. 390-1 at ¶ 27.[5] Defendant Finster was a trainee during the entire time that she worked at Fravor Road. *See id.* at ¶ 28. Defendant Finster's training included an initial three-week introductory course, followed by on-the-job training throughout her one-year probationary trainee status. *See id.* at ¶ 29. Defendant Finster's training included instruction provided by OPWDD, which covered behavior management plans, intervention procedures, self-injurious behaviors ("SIBs") and other matters. *See id.* Defendant Finster was never in a supervisory position and never had authority to change Michael's care plan. *See id.* at ¶ 30. Further, Defendant Finster did not have the ability to discipline any co-workers. *See id.* Defendant Finster did not work at Fravor Road after July 14, 2011. *See id.* at ¶ 31.

The Central New York Developmental Disability Services Office ("CNYDDSO") encompassed approximately 200 facilities in 8 counties with about 2,400 staff and 1200 residents. *See* Dkt. No. 377-1 at ¶ 8. OPWDD is the state agency that oversees CNYDDSO. *See id.* at ¶ 10. Defendant John Gleason, who is currently retired, began working for CNYDDSO in 1980. *See id.* at ¶¶ 11-12. From 2007 through 2012, Defendant Gleason was the Acting Director or Director of

---

[5] The Court notes that counsel for Defendant Finster, as well as counsel for Defendants Dickerson, Motyka, and Reynolds, provided the Court with courtesy copies of their underlying motions and exhibits. Counsel failed, however, to provide the Court with the courtesy of binding the courtesy copies in any way whatsoever (although Defendant Finster's counsel did place a rubber band around all 310 pages of her motion). Defendants Dickerson, Motyka, and Reynolds' motion is comprised of 3,283 pages. While the Court appreciates counsel taking the time to provide the Court with courtesy copies of their voluminous motions, binding the papers in some way, *i.e.*, a staple, three-ring binder, etc., along with tabs separating and identifying the attached exhibits is necessary for such courtesy copies to be helpful in any meaningful way. This particular omission is made all the more egregious due to the fact that their counsel failed to provide any way to recognize what the exhibits listed on the docket actually are, since they are all simply titled "Exhibit(s)." *See* Dkt. No. 254. Compounding the issue is the fact that, even upon opening the documents labeled "Exhibit(s)," the first page of the document fails to identify what exhibit you are actually looking at.

CNYDDSO. *See id.* at ¶ 13. From July 2012 to November 2014, Defendant Gleason was the Associate Commissioner for State Operations for OPWDD. *See id.* at ¶ 14.

Defendant Anthony DiNuzzo, who has been retired since 2011, began working for CNYDDSO in 1979. *See* Dkt. No. 377-1 at ¶¶ 15-16. Between 2007 and 2011, Defendant DiNuzzo's position and title was Deputy Director for Quality Assurance. *See id.* at ¶ 17.

Defendant Lynette O'Brien has been employed with OPWDD for approximately thirty-seven years. *See id.* at ¶ 18.[6] Defendant O'Brien began as an Aide at the Syracuse Developmental Center. *See id.* at ¶ 19. Defendant O'Brien's current position and title is Acting Director of the Central New York Developmental Disability Services Office of Region 2 and the Deputy Director for CNYDDSO. *See id.* at ¶ 20. Between late 2009 and 2012, Defendant O'Brien's position and title was Developmental Disability Program Specialist IV ("DDPS4") and later Deputy Director for CNYDDSO. *See id.* at ¶ 21. As a DDPS4 and Deputy Director, it was part of Defendant O'Brien's job to supervise the team leaders for the program teams of all consumers/residents in CNYDDSO IRAs, including Michael's program team. *See id.* at ¶ 42. Moreover, according to Defendant O'Brien, as part of her responsibilities, she facilitated communication between program teams and the families of residents. *See id.* at ¶ 43.

Defendant Jeanette Maynes was employed by OPWDD as a Direct Care Staff Member at the Fravor Road facility from June 2008 to April 2011. *See* Dkt. No. 392-1 at ¶ 5. In their amended complaint, Plaintiffs allege that video footage shows Defendant Maynes yelling at Michael on March 25 and 28, 2011. *See* Dkt. No. 392-1 at ¶ 47. Defendant Maynes was subject to a disciplinary hearing for the March 25, 2011 incident. *See id.* at ¶ 50. In the disciplinary

---

[6] Defendants Gleason, O'Brien and DiNuzzo are collectively referred to as the "Administrative Defendants."

proceeding, the arbitrator concluded that the claim of psychological abuse was sustained because the video showed Defendant Maynes "speaking with an angry expression on her face and gesticulating much of the time" she was on camera. *See id.* at ¶ 51. However, the arbitrator concluded that the claim of physical abuse was not sustained because the video did not show whether Defendant Maynes struck Michael. *See id.* at ¶ 52.

Also during the relevant time, Defendant Laurie Elliott was employed as a Treatment Team Leader with OPWDD. *See* Dkt. No. 394-1 at ¶ 451. Defendant Elliott has worked for OPWDD for approximately thirty years, and has been a Treatment Team Lead for approximately seven years. *See id.* at ¶¶ 466-67. As Treatment Team Leader, Defendant Elliott oversaw seven OPWDD care facilities, including the Fravor Road facility. *See id.* at ¶ 468. As a Treatment Team Leader, Defendant Elliott visited Fravor Road approximately once every two weeks during the times relevant to this action. *See id.* at ¶ 469.

Defendants Barbara Alexander, Ron Reid, Ray Perkins, Victoria LeBoeuf,[7] and Tracey Jasiewicz were all employed as Developmental Assistants at the Fravor Road facility during the relevant time period. *See* Dkt. No. 394-1 at ¶ 450. Defendant Alexander has worked for OPWDD for approximately twenty-nine years. *See id.* at ¶ 497. She was involved with the Fravor Road facility from August 2007 through October 2012. *See id.* at ¶ 498. Defendant Alexander was a Developmental Assistant III and visited the Fravor Road facility approximately two times per week for approximately four hours each visit. *See id.* at ¶¶ 499-501. When visiting Fravor Road, Defendant Alexander would meet with the site supervisor, work on the computer, observe and interact with the staff and residents, complete personal allowance audits, provide

---

[7] Defendants Elliott, Alexander, Reid, LeBoeuf, and Perkins are collectively referred to as the "Supervisory Defendants."

training to the staff, respond to physical plant issues, and review and bundle records, such as habilitation plans and billing records. *See id.* at ¶ 502. Moreover, Defendant Alexander was part of Michael's treatment team. *See id.* at ¶ 503. As a Developmental Assistant III, Defendant Alexander was not present at Fravor Road at all times to supervise Michael's direct care providers and observe their actions regarding Michael's dining plan, toileting, and general medical care. *See id.* at ¶¶ 510-14.

Defendant Ron Reid has worked for OPWDD for approximately twenty-five years. *See* Dkt. No. 394-1 at ¶ 537. Defendant Reid was employed at the Fravor Road facility from June 21, 2007 to January 10, 2008 and again from February 25, 2010 to October 18, 2012, as a Developmental Assistant II. *See id.* at ¶ 538. In this position, Defendant Reid "would maintain schedules, set out the house budget, maintain personal funds for the residents, attend meetings for the residents, maintain house vehicles, and maintain the house." *Id.* at ¶ 539. Further, according to Plaintiffs, Defendant Reid was also responsible for tracking the medication re-certification dates for employees. *See id.* As a Developmental Assistant II, Defendant Reid generally worked at Fravor Road five days per week. *See id.* at ¶ 540. Moreover, in this capacity, he would occasionally pass medications to Michael and was otherwise occasionally involved with Michael's personal care. *See id.* at ¶¶ 544, 551, 553. On October 18, 2012, Defendant Reid was promoted to Developmental Assistant III. *See id.* at ¶ 541. As a Developmental Assistant III, Defendant Reid oversaw four houses, including Fravor Road and Central Square SOIRA ("Central Square"). *See id.* at ¶ 542. According to Defendant Reid, as a Developmental Assistant III, he did not personally administer medications to Michael. *See id.* at ¶ 545.

Defendant Victoria LeBoeuf worked for the OPWDD for approximately thirteen years and was employed at Fravor Road from February 14, 2008 until December 31, 2009 as a

Developmental Assistant II.  *See* Dkt. No. 394-1 at ¶¶ 581-82.  While she was a Developmental Assistant II at Fravor Road, she maintained schedules, worked on the house budget, maintained personal funds for the residents, attended meetings for the residents, and maintained the house. *See id.* at ¶ 583.  Moreover, according to Plaintiffs, as a Developmental Assistant II, Defendant LeBoeuf was also responsible for "the overall function of the house, including cleanliness, adherence to safety guidelines, and supervising the direct care workers to ensure that they were performing their responsibilities."  *Id.*  Further, in this role, Defendant LeBoeuf would occasionally pass medications to Michael.  *See id.* at ¶ 585.  Also, Defendant LeBoeuf was occasionally involved in applying Michael's wrist splint and with his general personal care.  *See id.* at ¶¶ 587, 590.  According to Defendant LeBoeuf, "[i]f she ever noticed Michael had an injury, she would document and/or report it as required by OPWDD regulations depending on the severity of the injury and seek appropriate medical treatment for Michael."  *Id.* at ¶ 597. Moreover, Defendant LeBoeuf contends that she would also seek appropriate medical treatment for Michael when needed, whether that meant treating more minor injuries herself or taking Michael to a hospital or emergency room for urgent treatment.  *See id.* at ¶ 600.

Defendant Ray Perkins has worked for OPWDD for approximately sixteen years and was employed at Fravor Road from January 29, 2009 through December 30, 2010 as a Development Assistant I Trainee.  *See* Dkt. No. 394-1 at ¶¶ 609-610.  While a Developmental Assistant I Trainee at Fravor Road, he generally worked split shifts with three evenings and two days.  The evening shifts were from 2:00 p.m. or 3:00 p.m. to 10:00 p.m. or 11:00 p.m., and the day shifts were from 7:00 a.m. to 3:00 p.m.  *See id.* at ¶ 611.  As a Developmental Assistant I Trainee, Defendant Perkins claims that he had no supervisory responsibility or authority over the administration of medication to Michael or any other Fravor Road resident, and he had no

supervisory authority or responsibility over nurses or nurse supervisors at Fravor Road. *See id.* at

¶ 612. Defendant Perkins would, however, occasionally pass medications to Michael and was

otherwise occasionally involved with Michael's personal care. *See id.* at ¶¶ 613, 615, 618.

Defendant Cora Spencer is a Direct Support Assistant ("DSA") and held that position

during the entire time she worked at Fravor Road. *See* Dkt. No. 389-1 at ¶ 9. Defendant Spencer

worked at Fravor Road from October 2007 until April 2011 and from July 2011 until August

2012. *See id.* at ¶ 1 (Plaintiffs' Counterstatement of Material Facts). The job description for

Defendant Spencer's position states, among other things, that it is "entry level" and is to be

performed "under general supervision of clinical or higher level staff." Dkt. No. 389-1 at ¶ 10;

*see also* Dkt. No. 252-2 at 1-5. According to Defendant Spencer, as a DSA she "was never a

supervisor while at Fravor Road and did not supervise any work performed by co-workers,

including medication administration." Dkt. No. 389-1 at ¶ 11.[8] As a DSA, Defendant Spencer

never disciplined, trained, or evaluated the job performance of any of her co-workers at Fravor

Road and did not have the authority or power to ban individuals from the facility. *See id.* at ¶¶

12-13.

Defendants Monique Dickerson, Donna Motyka, and Denise Reynolds (collectively, the

"Nurse Defendants"), who are all registered professional nurses ("RN"), were employed by

OPWDD during certain portions of the relevant time period with the title "Supervising RN." Dkt.

---

[8] The Court notes that Plaintiffs deny this assertion and claim that "Defendant Spencer
worked for the agency for about twenty-years . . . and was tasked to supervise Michael Surlock
and as a mandated reporter she had a heightened obligation to monitor her co-workers and report
neglect." Dkt. No. 389-1 at ¶ 11 (internal citations omitted). This denial is one of many made in
response to the pending motions for summary judgment that entirely misconstrues the underlying
statement of fact. The underlying statement of fact clearly states that Defendant Spencer did not
supervise "co-workers," which is an entirely accurate statement given that the job is described as
an "entry level" position.

No. 385-1 at ¶ 6. Specifically, Defendant Motyka oversaw Fravor Road as the Supervising RN from the time of Michael's arrival in October 2007 until July 2009. *See id.* at ¶ 7. Defendant Reynolds held the position from July 2009 until May 2010, when Defendant Dickerson took over as the Supervising RN. *See id.* The Office of Mental Retardation and Developmental Disabilities' (a precursor to OPWDD) guidelines require that IRAs employ Registered Professional Nurses responsible for supervising the unlicensed direct care staff in their performance of nursing tasks and activities. *See id.* at ¶ 9. Generally, the Supervising RN's role is limited to providing oversight of the direct care staff in relation to the performance of nursing tasks and activities. *See id.* at ¶ 12. The Supervising RNs do not supervise the direct care staff in their day-to-day responsibilities except in relation to performance of nursing tasks and activities. *See id.* at ¶ 13. According to Defendants, adequate supervision, as defined by the OMRDD guidelines, is achieved by the Supervising RNs by ensuring that the direct care staff are trained to perform the nursing task or activity in question and periodically inspecting that performance. *See id.* at ¶ 14 (citing OMRDD Mem. # 2003-01).[9] Supervising RNs are not present at the facilities on a day-to-day basis, but the Supervising RNs are required to visit each residence assigned to them at least once every week. *See id.* at ¶ 15. The direct care staff are required to notify the Supervising RN or the RN on call regarding any changes in medical orders or the medical status of the individuals residing at the IRA to ensure they receive proper medical attention when needed. *See id.* at ¶ 17. Moreover, Supervising RNs develop and annually update individualized plans for nursing services for any individual requiring nursing care or medications. *See id.* at ¶

---

[9] Plaintiffs again deny this allegation and contend that "[w]hether OMRDD guidelines make this statement, adequate supervision did not occur simply by training direct care staff and periodically inspecting performance." Dkt. No. 385-1 at ¶ 14.

18. Further, when delegating nursing tasks or activities to direct care workers, the Supervising RN employs her professional judgment, and she considers the complexity of the task, the condition of the individual involved, and the training, skill, and experience of the staff in question. *See id.* at ¶ 20. Moreover, the Supervising RNs are required to certify the direct care staff for medication administration. *See id.* at ¶ 23. Each individual certified as an Approved Medication Administration Personnel ("AMAP") is subject to yearly re-certification, which includes a review of medication administration performance and any errors made over the past year, an update and review of medications and policies, a review of the "five rights" of medication administration, and an observation of one errorless medication pass. *See id.* at ¶ 24.

Defendant Felicia Graham[10] was the Fravor Road Assistant House Director from January 2008 until July 2008.[11] *See* Dkt. No. 258-5 at 1. According to Defendant Graham, during her tenure, "the [Fravor Road] facility was in disrepair and basically unclean." Dkt. No. 258-33 at ¶ 34. Moreover, according to Defendant Graham, she was accused of abusing Michael as follows: "Michael was seated in a chair. Felicia Graham approached Surlock, sat onto his lap with her legs across his thighs, poked his nose and stated 'I hate you, you are bad.'" *Id.* at ¶ 35. After this event, Defendant Graham was transferred to another home and did not return to Fravor Road. *See id.* at ¶ 99.

---

[10] Defendant Felicia Graham is referred to as Felicia Graham, Felicia Weber, and Felicia Graham-Weber throughout her moving papers. To avoid confusion, the Court will refer to her as Felicia Graham.

[11] The Court notes that Defendant Graham's statement of material facts is replete with vague and incomplete statements. *See* Dkt. No. 258-33. For example, paragraph eighteen states as follows: "The interrogatories state (Exhibit 5 114)." *Id.* at ¶ 18. One has to assume that the Court is being directed to exhibit 5, which is "Plaintiffs' Second Supplemental Response and Objections to Defendant Graham Weber's Interrogatories" so that the Court can decide for itself what is relevant and probably should have been included in the statement of material facts.

**B.       General allegations of abuse and neglect**

Plaintiffs claim that throughout Michael's time as a resident at Fravor Road he was subjected to numerous incidents of abuse and neglect, and that his constitutional rights were thereby violated.  These allegations include injuries that were caused directly by staff, by his own actions, or were of unknown origins.  For purposes of the present motion, the Court will set forth the alleged injuries and incidents below as they pertain to the individual Defendants.  The fact that these injuries occurred, in most instances, is undisputed.  Instead, the parties disagree as to whether Michael's constitutional rights were violated and whether the individual Defendants sued herein can be held responsible for these injuries.[12]

# III. DISCUSSION

**A.       Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a

---

[12] For many of their allegations, Plaintiffs rely on several videos.  These videos, which do not contain audio, were obtained from a camera that Plaintiffs Mary-Anne and Bradford Surlock placed in a clock radio on a shelf in Michael's room in February of 2011.  *See* Dkt. No. 375-3 at 2. According to Mary-Anne, they placed the video camera in his room because they had periodically observed that Michael had indications of injuries.  *See id.*  Mary-Anne and Bradford would regularly review the video taken by the camera.  *See id.*

motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.     42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a Section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.*

(citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

## C.     Personal involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and other citations omitted). "'[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.'" *Id*. (quoting *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal involvement of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

## D.     Statute of limitations

Although Section 1983 contains no explicit statute of limitations, New York law is "borrow[ed]," and applies a three-year limitation on such claims. *See Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citation omitted); N.Y. C.P.L.R. § 214(5); *see also Romer v. Leary*, 425 F.2d 186, 187 (2d Cir. 1970); *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 113

(N.D.N.Y. 2000) (citation omitted).  While the court must apply New York's three-year statute of limitations, federal law governs the accrual date for these claims.  Pursuant to federal law, accrual occurs "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl*, 292 F.3d at 80 (citation omitted).  In addition, federal courts also borrow the state's tolling provision. *See Pearl v. City of Long Beach*, 296 F.3d 76, 80-81 (2d Cir. 2002) (citation omitted).

Under New York law, the statute of limitations period may be tolled "[i]f a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues[.]"  N.Y. C.P.L.R. § 208.  "The insanity toll of CPLR 208 is available to 'those individuals who are unable to protect their legal rights because of an over-all inability to function in society.'" *Garvey v. Lutheran Med. Ctr.*, 137 A.D.3d 1212, 1212 (2d Dep't 2016) (quotation omitted).

Plaintiffs commenced this action on September 21, 2011. *See* Dkt. No. 1.  Several Defendants contend that some of the allegations are outside of the applicable three-year statute of limitations.  Plaintiffs, however, have sufficiently demonstrated that Michael was under a disability throughout the relevant time period.  As such, Michael's claims against all Defendants were tolled and, therefore, timely.

Plaintiffs Bradford and Mary-Anne, however, are not entitled to the same tolling as to their individual claims.  Plaintiffs Bradford and Mary-Anne assert claims of First Amendment retaliation and freedom of association, and Fourteenth Amendment procedural due process against various Defendants.  To the extent that any of the conduct alleged in support of those

claims occurred before September 21, 2008, it is beyond the statute of limitations and, therefore, subject to dismissal.[13]

## E.     Law of the case

Throughout their memorandum of law in response to the pending motions for summary judgment, Plaintiffs repeatedly contend that by denying the previous motion to dismiss, the remaining claims must survive the motions for summary judgment since they have produced evidence to substantiate the allegations contained in the complaint. *See, e.g.,* Dkt. No. 371 at 33. Plaintiffs rely on, among other cases, *ACLI Government Securities v. Rhoades*, No., 97 Civ. 2471, 1998 WL 142347 (S.D.N.Y. Mar. 26, 1998), in support of their argument. *See* Dkt. No. 371 at 26. In *ACLI*, the defendant argued that the court lacked subject matter jurisdiction over the case because the parties were not completely diverse. *See ACLI*, 1998 WL 142347, at *1. In a March 25, 1997 order, the court had denied the defendant's motion to dismiss for lack of subject matter jurisdiction, in which the defendant raised the exact same arguments. *See id.* In denying the motion to dismiss for lack of subject matter jurisdiction, the court specifically relied on evidence outside of the pleadings to resolve the disputed jurisdictional fact issues. *See ACLI Government Securities, Inc. v. Rhoades*, No. 96 Civ. 7502, 1997 WL 137437, *1-*3 (S.D.N.Y. Mar. 25, 1997). As such, the court rejected the defendant's arguments in the later proceeding, finding that they were barred by the law of the case doctrine. *See ACLI*, 1998 WL 142347, at *1.

Unlike the authority upon which Plaintiffs rely, in the present matter the Court has only rendered a decision determining the plausibility of the allegations in the complaint. *See* Dkt. No.

---

[13] As discussed below, however, the Court has granted the pending motions for summary judgment as to all of Mary-Anne and Bradford's claims.

106. Contrary to Plaintiffs' arguments, the law of the case doctrine does not preclude the Court from granting summary judgment simply because Plaintiffs have now produced evidence they claim supports the allegations the Court found sufficient in denying Defendants' motion to dismiss. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013) (holding that the law of the case doctrine "would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations") (citation omitted); *see also McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142-43 (E.D.N.Y. 2009) (holding that if a court first resolves a motion to dismiss and is then presented with the same issues on summary judgment, the doctrine would not apply "because of the divergent standard of review applicable to motions to dismiss and motions for summary judgment") (citation omitted).

Based on the foregoing, the Court finds that law of the case is inapplicable to the present matter.

**F.    Substantive due process**

Plaintiffs have alleged substantive due process violations against Defendants Gleason, O'Brien, DiNuzzo, Elliott, Alexander, Reid, LeBoeuf, Perkins, Graham, Dickerson, Reynolds, Motyka, Spencer, Maynes, and Finster.

*1. Substantive due process standard*

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property."  U.S. CONST. AMEND. XIV, § 1.  However, the scope of substantive due process is very limited.  *See Washington v. Glucksberg*, 521 U.S. 702, 720

(1997).  The Supreme Court has said that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted).

Generally, to establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the government's action were conscience-shocking or arbitrary in the constitutional sense.  *See Little v. City of New York*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).  The "shock the conscience" standard is not easily met; the plaintiff must show that the government's conduct was "'egregious'" and "'outrageous,'" not "not merely incorrect or ill-advised."  *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (quotation omitted).  Courts have generally found that verbal abuse alone is not normally sufficient to satisfy the shock the conscience standard.  *See M.C. v. Arlington Cent. Sch. Dist.*, No. 11-cv-1835, 2012 WL 3020087, *5 (S.D.N.Y. July 24, 2012) (citations omitted); *see also T.W. v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 601-02 (11th Cir. 2010) ("It is clear that '[p]laintiffs have not fared well where psychological damage forms either the sole basis of or is an element of the plaintiff's substantive due process claim,' . . . but we can imagine a case where an exercise of corporal punishment — even one that causes only psychological injury — might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in *Rochin*") (quoting *Dockery v. Barnett*, 167 F. Supp. 2d 597, 603 (S.D.N.Y. 2001)) (other citation omitted); *but see H.M. v. Bd. of Educ. of Kings Local Sch. Dist.*, No. 1:14-cv-64, 2015 WL 4624629, *6 (S.D. Ohio Aug. 3, 2015) (denying the motion to dismiss and holding that "while courts that have permitted substantive due process claims to proceed to trial customarily require the student to

21

sustain dramatic physical injuries, the parties have directed the Court to no caselaw indicating that psychological injury standing alone or with minimal physical injury can never pass the constitutional threshold") (citations omitted).

To satisfy his or her burden, a plaintiff must demonstrate that the defendant's actions were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Matican v. City of New York*, 524 F.3d 151, 158 (2d Cir. 2008). In *Lewis*, the Supreme Court noted that intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. On the other end of the spectrum, the Supreme Court has emphasized that "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.*; *see also Okin*, 577 F.3d at 431 (distinguishing between intentionally inflicted harms, which are likely to rise to conscience shocking level, and negligently inflicted harms, which cannot constitute conscience-shocking behavior). In between these poles, the Supreme Court has held "that harm inflicted recklessly or with deliberate indifference does not shock the conscience in the context of a time sensitive emergency such as a high-speed chase." *Matican*, 524 F.3d at 158 (citing Lewis, 523 U.S. at 853-54, 118 S. Ct. 1708). However, even in the context of deliberative decision-making, the Second Circuit has recognized that where state actors have been subject "to the pull of competing obligations," *Lombardi*, 485 F.3d at 83 (internal quotation marks omitted), the courts should be reluctant to impose "broad constitutional liability for the government officials, whose decisionmaking might be inhibited by the threat of lawsuits," *Matican*, 524 F.3d at 159 (citing *Lombardi*, 485 F.3d at 84). But where "the alleged behavior of ... defendants [took place] over an extended period of time and in the face of action that presented an obvious risk of severe consequences and extreme danger," the Second Circuit has found that official inaction can

shock the conscience. *Pena*, 432 F.3d at 114; *see also Okin*, 577 F.3d at 431-32 (finding that the plaintiffs' allegations regarding the officers' repeated failure to address obvious domestic abuse created a triable issue about the officers' deliberate indifference and their conscience-shocking behavior).

In determining whether alleged conduct shocks the conscience, the court has to consider the totality of the circumstances. *See Hatfield v. O'Neill*, 534 Fed. Appx. 838, 847 (11th Cir. 2013) (citing *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1075 (11th Cir. 2000)). Some courts have found that "'the conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.'" *Id.* (quoting *M.S. ex rel. Soltys v. Seminole Cnty. School Bd.*, 636 F. Supp. 2d 1317, 1323 (M.D. Fla. 2009)).

### 2. Confusion regarding the appropriate standard

A person in non-punitive state custody has several interests protected by due process: a liberty interest in personal safety, an interest in freedom from undue bodily restraints and excessive force, and an interest in adequate medical care and treatment. *See Youngberg v. Romeo*, 457 U.S. 307, 315-19, 324 (1982). Further, when individuals are placed in custody or under the care of the government, sometimes their governmental custodians are charged with affirmative duties, the non-feasance of which may violate the Constitution. *See P.C. v. McLaughlin*, 913 F.2d 1033, 1044 (2d Cir. 1990) (quotation omitted). Such individuals also have a right to be protected from harm. *See O'Dell v. Bill*, No. 9:13-cv-1275, 2015 WL 710544, *5 (N.D.N.Y. Feb. 18, 2015). Moreover, they are also entitled to adequate medical care and such claims are analyzed under the same standard applied to deliberate indifference claims brought by

convicted prisoners and pretrial detainees under the Eighth Amendment. *See James v. Kaskiw*, No. 9:13-cv-526, 2016 WL 770193, *4 (N.D.N.Y. Jan. 28, 2016) (citation omitted); *see also Ahlers v. Kaskiw*, No. 9:12–CV–501, 2014 WL 4184752, *5 (N.D.N.Y. Aug. 21, 2014) (collecting cases); *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) ("The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being'") (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There has been some confusion as to the appropriate legal standard to apply to substantive due process claims alleged by involuntarily committed patients. Some circuits follow *Youngberg* and hold that the standard for determining whether an involuntarily committed patient's substantive due process rights have been violated is whether a "decision by [a] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323; *see also Amnions v. Washington Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but recognizing the application of the

deliberate indifference standard for claims alleged against non-professionals); *Patten v. Nichols*, 274 F.3d 829, 838 (4th Cir. 2001) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients and rejecting the deliberate indifference standard for involuntarily committed patients); *Feagley v. Waddill*, 868 F.2d 1437, 1439-40 (5th Cir. 1989) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *but see Lavender v. Kearney*, 206 Fed. Appx. 860 (11th Cir. 2006) (interpreting *Youngberg* as articulating a standard of deliberate indifference for Fourteenth Amendment claims alleged by involuntarily committed patients).

Other circuits follow the Supreme Court's ruling in *County of Sacramento v. Lewis* which applied the "shocks the conscience" standard to all substantive due process claims involving "abusive executive action." *Lewis*, 523 U.S. at 846; *see also Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 174 (3d Cir. 2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir. 2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but noting that "conduct may shock the conscience of federal judges only if [defendants] acted with 'deliberate indifference'") (emphasis omitted); *but see Davis v. Rennie*, 264 F.3d 86, 99 (1st Cir. 2001) (finding that the lower court did not err by declining to give a shocks the conscience instruction for a substantive due process claim alleged by an involuntarily committed patient). As discussed above, under this standard, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

In *Lewis*, the Court noted that, in a substantive due process claim brought under the Fourteenth Amendment by a pretrial detainee, deliberately indifferent conduct could shock the conscience. *See id.* at 849-50. Based on this language, other courts have noted that deliberate indifference is the appropriate standard against non-professional individuals. *See Groves v. Davis*, No. 9:11–CV–1317, 2012 WL 651919, *3 (N.D.N.Y. Feb. 28, 2012); *McChesney*, 2010 WL 3613806 at *6; *Lane*, 2009 WL 3074344, at *19; *Vallen*, 2005 WL 2296620, at *9 (also considering the shocks the conscience standard); *Daniel H. ex rel. Hardaway H. v. City of New York*, 115 F. Supp. 2d 423, 430 (S.D.N.Y. 2000) (only considering deliberate indifference standard); *cf. Yeldon*, 2012 WL 1995839, at *7 (acknowledging both standards but declining to favor one); *Dove*, 2007 WL 805786, at *8 (acknowledging both standards but declining to favor one).

The Second Circuit has applied the professional judgment standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients against professionals. *See Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188-89 (2d Cir. 2005) (citing *Rodriguez v. City of New York*, 72 F.3d 1051, 1061-62 (2d Cir. 1995)). The Supreme Court has defined a professional for purposes of the professional judgment standard as:

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.

*Youngberg*, 457 U.S. at 323 n.30.

However, the Second Circuit has not specifically articulated whether to apply this standard to substantive due process violations under the Fourteenth Amendment alleged by

persons in non-punitive state custody against non-professionals. Moreover, *Olivier* involved a physician's decision to involuntarily commit the plaintiff pursuant to New York Mental Hygiene Law § 9.39. District courts within the Second Circuit have distinguished cases applying the professional judgment standard found in *Youngberg* from cases where the defendants – such as psychiatric center aides – are "low-level staff members." *Vallen v. Carrol*, No. 02 Civ. 5666, 2005 WL 2296620, *8 (S.D.N.Y. Sept. 20, 2005) (determining that the defendant security hospital treatment assistants at Mid-Hudson Forensic Psychiatric Center were low-level staff members); *see also McChesney v. Hogan*, No. 9:08-CV-0563, 2010 WL 3613806, *5 (N.D.N.Y. Aug. 11, 2010) (citing *Vallen* to find that the security hospital treatment assistants at Central New York Psychiatric Center were not professionals); *Dove v. City of New York*, No. 03-CV-5052, 2007 WL 805786, *8 (E.D.N.Y. Mar. 15, 2007) (acknowledging that both circuit and district courts have chosen to apply a standard of deliberate indifference to non-professionals as suggested in *Youngberg*).

Although these decisions often applied seemingly different standards, often without explanation, the Supreme Court has consistently made clear that, at its core, the concept of due process is intended to protect against the arbitrary exercise of the powers of the government. *See Lewis*, 523 U.S. at 845. Determining whether the right to due process has been abridged requires a balancing of the individual's liberty interest against the government's asserted reasons for infringing upon that individual liberty. The Supreme Court has indicated that the shocks-the-conscience inquiry is not a stand-alone inquiry for determining whether particular executive conduct violates substantive due process; rather, it provides a framework for making such determinations. *Id.* at 847. These seemingly varying "standards" that have been applied are more appropriately described as different iterations of how to decide if conduct meets the shocks-the-

conscience standard, made to better fit within specific factual situations. As the Supreme Court

and Second Circuit have noted,

> "'[t]he phrase [due process of law] formulates a concept less rigid
> and more fluid than those envisaged in other specific and particular
> provisions of the Bill of Rights. Its application is less a matter of
> rule. Asserted denial is to be tested by an appraisal of the totality of
> facts in a given case. That which may, in one setting, constitute a
> denial of fundamental fairness, shocking to the universal sense of
> justice, may, in other circumstances, and in the light of other
> considerations, fall short of such denial.'"

*Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010) (quoting *Betts v. Brady*, 316 U.S. 455, 462,

62 S. Ct. 1252, 86 L. Ed. 2d 1595 (1942)) (other quotation omitted). Therefore, "'concern with

preserving the constitutional proportions of substantive due process demands an exact analysis of

circumstances before any abuse of power is condemned as conscience shocking.'" *Id.* (quotation

omitted).

In *Bolmer*, the plaintiff claimed that his substantive due process rights were violated when

he was involuntarily committed. *See Bolmer*, 594 F.3d at 138. On appeal, the plaintiff argued

that the district court erred by applying the "medical-standards test" as opposed to the shocked-

the-conscience test set forth in *Lewis*. *See id.* at 144. The Second Circuit disagreed and held that

the "medical-standards test . . . imposed a rule for determining when an involuntary commitment

violates substantive due process that is consistent with *Lewis'* shocks-the-conscience framework.

In other words, a physician's decision to involuntarily commit a mentally ill person because he

imposes a danger to himself or others shocks the conscience, thereby violating substantive due

process, when the decision is based on 'substantive and procedural criteria that are . . .

substantially below the standards generally accepted in the medical community.'" *Id.* (quoting

*Rodriguez*, 72 F.3d at 1063. Further, in *Lewis*, the Supreme Court explained that, since the due

process rights of a pretrial detainee are "'at least as great as the Eighth Amendment protections available to a convicted prisoner," it follows that "deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims" based on the medical needs of someone in non-punitive state custody. *See Lewis*, 523 U.S. at 849-50 (citations omitted).

These differing "standards" set forth above make it clear that they are in fact merely different ways of determining whether government conduct rises to the level of shocking the conscience, taking into consideration the given factual circumstances of a particular case. As such, the Court will address Plaintiffs' substantive due process claims taking into consideration the various applications that courts have applied.

### 3. Defendant Graham

As to Defendant Graham, Plaintiffs primarily allege that on July 7, 2008 Defendant Graham "sat on Michael's lap, poked her finger at his noise [sic] and declared, 'I fucking hate you. You are so bad.'" Dkt. No. 371 at 33. According to Defendant Graham, on this date, when Michael started yelling, she put her legs over his legs in an effort to calm him. *See* Dkt. No. 393-1 at ¶¶ 86-88.[14] According to Plaintiffs, Defendant Graham did not place her legs across Michael's legs in an effort to calm him. *See id.* at ¶ 88. Further, Plaintiffs claim that the exhibit demonstrates that Defendant Graham "sat on Michael's lap." *Id.* According to Defendant Maynes, as a result of this incident, Michael "'didn't appear to be upset, but . . . it was difficult to

---

[14] Defendant Graham contends that "Michael was yelling." Dkt. No. 258-33 at ¶ 87 (citing Exhibit 23, pg. 324). For reasons unknown, Plaintiffs deny this assertion as follows: "Deny. The exhibit does not support this statement since it says Michael was 'somewhat loud and yelling.' . . . And so the defendant has failed to support the asserted statement by a 'specific citation to the record where the fact is established.'" Dkt. No. 393-1 at ¶ 87.

tell.'" *Id.* at ¶ 91. Mr. Douglas Lee conducted an official investigation of this incident. Defendant Graham was investigated for her verbal statement to Michael, but she was not investigated for any alleged physical abuse. *See id.* at ¶¶ 95-96. Mr. Lee recommended to the committee that Defendant Graham should be demoted to Developmental Aide. *See id.* at ¶ 97. The committee, however, did not act on this recommendation because Susan Skiff provided testimony that contradicted Defendant Maynes' allegations. *See id.* at ¶ 98. Nevertheless, Defendant Graham did not return to Fravor Road after this incident and was transferred to another facility. *See id.* at ¶ 99. Plaintiffs admit that there is no evidence that Michael was physically injured as a result of this incident. *See id.* at ¶ 101.

Plaintiffs also contend that, while Defendant Graham served as Assistant House Director from January through July of 2008, "house staff were responsible for four medication administration failures . . . and two reported incidents of staff abuse and/or neglect of Michael, . . . who was admitted on two occasions to the emergency room." Dkt. No. 393-1 at ¶ 3. As to medication errors, Plaintiffs specifically allege the following incidents: (1) Protonix overdose on February 14, 2008; (2) missed dose of Bentyl on April 6, 2008; (3) "under dose" of Dicyclomine on May 16, 2008; and (4) missed dose of Protonix on May 28, 2008. *See id.* at ¶ 4. Further, in addition to the July 7, 2008 incident, Plaintiffs contend that on July 3, 2008 Michael was left in his safe chair[15] unattended with a restrictive device on. *See id.* at ¶ 5; *see also* Dkt. No. 371-4 at 1. According to the incident report, the July 3, 2008 incident involved an employee by the name

---

[15] The "safe chair" is a chair with a high back, which was "tilted about forty-five degrees." Dkt. No. 394-2 at ¶ 10. The purpose of the chair was to provide a refuge for Michael so that he could calm himself before he escalated into self-injurious behavior. *See id.* Moreover, the safe chair was equipped with restraints, including a device referred to as a "bear hug," which were used to restrain Michael while he was engaged in SIBs.

of Amy Wallace, who had mistakenly left the "bear hug" in place and, contrary to protocol, was more than arms length away from Michael for a period of "no more than 2 minutes." Dkt. No. 371-4 at 3. As a result of the incident, Amy Wallace was "retrained" before working again with Michael. *See id.* at 3-4.

Aside from the July 7, 2008 incident, notably absent from all of these alleged incidents is any reference to Defendant Graham. Further, there is no indication that Defendant Graham was even working at Fravor Road when these incidents took place. Without such proof, Plaintiffs have failed to establish that Defendant Graham was personally involved in these incidents. Moreover, even if Defendant Graham had been working during the alleged medication incidents and when Michael was left unattended in his chair for less than two minutes, these allegations are patently insufficient to meet the shocks the conscience standard. Both the medication incidents and the July 3, 2008 incident amount to negligence at best. Further, as discussed, after the July 3, 2008 incident, Amy Wallace was retrained before working again with Michael. Far from conscience shocking, the response to the July 3, 2008 incident demonstrates responsive supervision by Ms. Wallace's superiors.

As to the July 7, 2008 incident, while Defendant Graham's conduct was certainly inappropriate, it still fails to shock the contemporary conscience. In *M.M. v. Tredyffrin/Easttown Sch. Dist.*, No. 06-cv-1966, 2006 WL 2561242 (E.D. Pa. Sept. 1, 2006), the plaintiff was a disabled elementary school student who alleged that the defendants, among other things, violated his substantive due process right to bodily integrity. Specifically, the plaintiff alleged that a third-grade teacher had made negative comments about the plaintiff's handwriting, as well as several incidents of "staring and intimidation," which led the plaintiff to seek psychological counseling. *See id.* at *12. The defendant also allegedly deliberately stepped on the plaintiff's finger, causing

pain and requiring the finger to be put into a splint. *See id.* Dismissing the substantive due process claim, the district court found that the alleged physical and non-physical incidents "do not illustrate sufficiently severe verbal, psychological or physical abuse to qualify as conscience-shocking behavior." *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)) (other quotation and citations omitted).

In *Jackson v. Sumner Cty. Bd. of Educ.*, No. 3:09-cv-1005, 2011 WL 42618 (M.D. Tenn. Jan. 6, 2011), the plaintiff was an elementary school child with impaired hearing and communication abilities, and the primary defendant was the plaintiff's special education teacher. *See id.* at *2-*3. On several occasions, the defendant allegedly squeezed the plaintiff's cheek, "slammed" the plaintiff into a chair to make him sit down, and "jerked" the plaintiff off of a step-stool in front of the water fountain because the plaintiff did not have permission to get a drink. *See id.* at *3. Further, one time when the plaintiff cut into a line, the defendant shoved him into a bookcase. *See id.* Granting the defendant's motion for summary judgment, the court held as follows: "In sum total, the evidence in this record indicates that [the defendant] shoved [the plaintiff] against a bookshelf, squeezed his face painfully tightly on at least one occasion, forcefully 'slammed' him into a chair, and 'yanked' him away from the drinking fountain. These incidents, while potentially abusive, did not cause severe physical harm and do not shock the conscience." *Id.* at *5.

In *Hartfield v. O'Neill*, 534 Fed. Appx. 838 (11th Cir. 2013), the plaintiff was an elementary school child who suffered from pronounced mental and physical disabilities, including hemimegalencephaly, which prevented the left side of her brain from fully developing. *See id.* at 840. Further, the plaintiff was blind, nonverbal, bound to a wheelchair that she was unable to maneuver on her own, and suffered from a seizure disorder. *See id.* The plaintiff's various

ailments rendered her with the mental and intellectual abilities of a one-year-old child, requiring around-the-clock care. *See id.* Prior to the events leading to the lawsuit, the plaintiff underwent a surgery whereby a substantial portion of her brain was removed and a shunt placed therein. *See id.* The surgical procedure left the plaintiff's head extremely tender at the location where the sizable portion of her brain had been removed, which caused mundane activities, such as brushing her hair, to be painful. *See id.* at 841. The defendant was the plaintiff's teacher for six years, until she was terminated due to conduct related to the case. *See id.* at 840. It was alleged that the defendant would occasionally "rip" excess skin from the plaintiff's peeling lips instead of applying Vaseline as instructed by the plaintiff's grandmother, which would occasionally cause the plaintiff's lips to bleed. *See id.* at 841. Further, the plaintiff alleged that the defendant was "purposefully forceful" in feeding her, causing her mouth to bleed. *See id.* The defendant also allegedly shoved the plaintiff's thumb down her throat in an effort to get her to stop sucking her thumb, which caused the plaintiff to gag and cry out in pain. *See id.* at 842. Finally, the defendant was also observed striking the plaintiff on numerous occasions with her hand and other objects. *See id.* The most serious of the strikes involved an incident in which the defendant backhanded the plaintiff on the side of her head that was rendered tender because of her prior surgery. *See id.*

Affirming the district court's denial of summary judgment on qualified immunity grounds, the Eleventh Circuit first concluded that the plaintiff's "allegations regarding forceful feeding and the removal of skin from [the plaintiff's] lips do not shock the conscience. There is a range of teacher conduct that is simply 'no[t] so conscience-shocking as to trigger a substantive due process violation.'" *Id.* at 845 (quoting *T.W. ex. rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 598 (11th Cir. 2010)). Further, the court found that the allegations relating to the

defendant forcing the plaintiff's thumb down her throat in an effort to stop her from sucking her thumb "are certainly more troubling but fall within this range as well." *Id.* However, the Circuit found that "striking a defenseless and profoundly disabled child on the head – at the precise location where she had previously undergone brain surgery and was particularly vulnerable – shocks the conscience of the court." *Id.* In reaching this conclusion, the court found that there was no need for the application of force and, therefore, no governmental interest in the application of such force. *See id.* at 845-46. Further, the court found that, although the plaintiff's disabilities made it difficult to fully discern the exact nature of her injuries, the fact that she experienced bruising, vomited, showed a lack of energy, and cried with pain weighed in favor of denying the defendant's motion for summary judgment. *See id.* at 846. Finally, the court noted that, at the time the defendant struck the plaintiff on her head, the defendant made numerous derogatory statements directed at the plaintiff which created an inference of subjective malice. *See id.* at 847. Considering the totality of the circumstances, the Eleventh Circuit found that the district court properly denied the defendant's motion for summary judgment as to the substantive due process claim. *See id.*

In the present matter, unlike the situation in *Hartfield*, Defendant Graham's alleged conduct falls far short of violating Michael's substantive due process rights. Unquestionably, sitting on a profoundly disabled individual's lap, poking him in the nose, and telling him "I fucking hate you" was unprofessional, deplorable conduct. However, this conduct, unaccompanied by any physical injuries or even the use of force intended to cause such a physical injury, is insufficient to satisfy the high burden of a substantive due process claim.

Based on the foregoing, the Court grants Defendant Graham's motion for summary judgment as to the substantive due process claim.

### *4. Defendant Finster*

Plaintiffs contend that, on March 28, 2011, Defendant Finster "unjustifiably pushed and shoved Michael and yanked him out of his room." Dkt. No. 371 at 31 (citing Dkt. No. 376-32 at 1). Additionally, Plaintiffs contend that a video from February 21, 2011 shows Defendant Finster slapping Michael while in his bedroom. *See id.* Further, Plaintiffs allege that Defendant Finster regularly observed Defendant Spencer verbally and physically abuse residents, including Michael, yet failed to report the conduct or otherwise prevent it from happening. *See id.* Moreover, Plaintiffs assert that Defendant Finster consistently failed to follow Michael's Residential Habilitation Plan by not teaching him daily living skills, such as dressing himself, putting his clothes in his closet hamper and then taking them to the laundry room, and making his bed. *See* Dkt. No. 390-1 at ¶¶ 14-18 (Plaintiffs' Counterstatement of Material Facts). Finally, Plaintiffs claim that Defendant Finster repeatedly failed to ensure that Michael wore his prescribed daytime wrist splint. *See id.* at ¶ 20.

As discussed, Plaintiffs contend that Defendant Finster failed to report incidents when Michael was abused by other employees, including an incident when Defendant Spencer placed a laundry basked on Michael's head. *See* Dkt. No. 390-1 at ¶ 28 (Plaintiffs' Counterstatement of Material Facts). Although Defendant Finster did testify that she was intimidated by Defendant Spencer and, at first, reluctant to report the incident involving the laundry basket, Defendant Finster reported the incident to her supervisor, Defendant Reid, the day after the incident occurred. *See* Dkt. No. 391-1 at 215, 217. Further, Defendant Finster testified that she had previously discussed with her supervisor Defendant Spencer's alleged vulgar and abusive language, which was directed at both residents and staff. *See id.* at 214-219. Such conduct, or lack thereof, does not rise to the level of a substantive due process violation.

As to the allegations that Michael was observed not wearing his wrist splint in Defendant Finster's company, they fail to constitute a substantive due process violation. Michael's Residential Habilitation Plan during the time at issue stated that he should "wear his left wrist cock up splint each hour for a minimum o[f] 15 minutes each hour or as tolerated from 8AM-8PM daily. Michael will wear his resting hand splint throughout the night." Dkt. No. 251-25 at 3. None of the videos in which Michael is allegedly not wearing his wrist splint are longer than two minutes in length. Simply put, the videos are not of sufficient length to determine whether Michael was or was not wearing his wrist splint for the minimum fifteen minutes per hour for any given hour that the videos purportedly capture. Further, most of the videos upon which Plaintiffs rely for this claim depict individuals other than Defendant Finster with Michael. Simply put, this alleged conduct fails to support Plaintiffs' substantive due process claim against Defendant Finster.

Notably, Plaintiffs have not directed the Court to any case in which a court has found a substantive due process violation from a factually similar situation. Undoubtedly, no such caselaw is available because failing to report the use of vulgar language used by a more senior employee, when supervisors have already been made aware that the employee is regularly engaging in such conduct, does not shock the conscience. While these actions and inactions may demonstrate bad judgment and insensitivity, even to a high degree, they are not "brutal" and "offensive" enough to meet the high standard of conscience shocking behavior. *See Lewis*, 523 U.S. at 847; *see also Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla.*, 960 F. Supp. 2d 1254, 1262-62 (N.D. Okla. 2013) (citations omitted).

Plaintiffs also contend that Michael's rights were violated when Defendant Finster repeatedly failed to follow his Residential Habilitation Plan. For example, Plaintiffs contend that,

despite the fact that the plan called for Michael to perform tasks such as fold his own laundry and make his own bed, Defendant Finster was repeatedly observed folding Michael's clothes and making Michael's bed. It goes without saying that making Michael's bed, folding his clothes, and helping with his laundry is not "brutal" and "offensive" conduct that shocks the Court's conscience.[16] Moreover, the Residential Habilitation Plan in place from February 14, 2011, identified nine non-exclusive tasks, four of which were to be completed by Michael each day, "with unlimited assistance." Dkt. No. 390-1 at ¶ 151. These tasks included "wiping tables, sweeping, mopping, vacuuming, collecting/taking out trash, dishes, laundry, picking up his personal belongings, tidying his room, etc." *Id.* at ¶ 152. Plaintiffs' video evidence, depicting Defendant Finster completing several of these tasks, without Michael's assistance, does not support the inference that the plan was not otherwise being followed throughout the day.

As to allegations pertaining to March 28, 2011, Defendant Finster is alleged to have mishandled Michael "by yanking and pushing him and then pulling him out of his bedroom." Dkt. No. 390-1 at ¶ 25 (Plaintiffs' Counterstatement of Material Facts). The incident was captured on video and was investigated by Mr. Douglas Lee. Based on his investigation, which included an interview with Defendant Finster and review of the hidden video taken from Michael's room, Mr. Lee concluded "that the allegation of physical [a]buse against Ms. Finster

---

[16] What is shocking is that Plaintiffs seem to be of the opinion that by folding Michael's laundry and making his bed, Defendant Finster somehow violated Michael's constitutional rights and should be held to account for such actions. What is even more shocking is that Plaintiffs also complain about the fact that they occasionally observed that Michael's clothing was wrinkled, improperly folded, or "deliberately folded in strange ways with sleeves going one way, away from the shirt, pants were placed on hangers with one pang leg inside-out, and other clothing was inside-out and/or stored in ways that resulted in excessive wrinkling and messy." Dkt. No. 390-3 at ¶ 17. So, Plaintiffs take issue not only when Defendants folded Michael's laundry, but also when they did not fold Michael's laundry in a satisfactory manner or, perhaps, when they permitted Michael to fold his own laundry.

towards [Michael] is substantiated[.]" Dkt. No. 391-1 at 307. When questioned about the conduct, Defendant Finster claimed that she was using a method of "personal persuasion." Dkt. No. 391-1 at 297. Defendant Finster stated that this was not an "official technique" and was unaware if anything in Michael's plan called for this type of escort. *See id.* at 297-98. Finally, Defendant Finster testified that she was attempting to get Michael to leave his room because if he stays in his room alone once he is fully dressed, he would often have behavioral issues. *See id.* at 298-99.

The Court has reviewed the video of the incident, Mr. Lee's report, and the other relevant evidence and finds that, while Defendant Finster's conduct could be considered misguided and in violation of protocols, it does not rise to the level of a substantive due process violation. The undisputed facts, including the video and Defendant Finster's testimony, clearly demonstrate that Defendant Finster was not acting with any malice in escorting Michael from his room. Rather, the undisputed evidence clearly demonstrates that Defendant Finster used a minimal amount of force to get a noncompliant Michael to leave his bedroom. *See Cox*, 654 F.3d at 276 (holding that a substantive due process claim requires more than an "incorrect or ill-advised" act and absent evidence that the defendant acted with malice, the plaintiff's substantive due process claim could not withstand summary judgment motion).

Finally, as to the allegation that Defendant Finster "unjustifiably slapped Michael while in his bedroom[,]" the Court finds that Plaintiffs have grossly exaggerated/misrepresented the alleged incident. The video upon which Plaintiffs rely shows Defendant Finster tenderly assisting Michael getting dressed and, at one point while Michael is laying down on the bed just below the camera angle, Defendant Finster slowly lowers her hand off camera in something similar to a slapping motion. Even assuming that Defendant Finster made contact with Michael, no

reasonable fact finder could conclude that Defendant Finster was acting with malice considering the speed at which her hand was moving, as well as the gentle manner in which she is otherwise assisting Michael. *See Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 170, 173 (2d Cir. 2002) (holding that "[s]triking a student without any pedagogical or disciplinary justification," while "undeniably wrong," does not "shock the conscience" even though the slap caused "great physical pain").

Based on the foregoing, the Court grants Defendant Finster's motion for summary judgment.

### 5. Defendant Jeanette Maynes

#### i. March 25, 2011 incident

Plaintiffs contend that, on March 25, 2011, Defendant Maynes walked into Michael's room while he was laying in bed and, "in a swift and violent motion, swung her hand down upon Michael, striking his back and ripping his blanket off of him. . . . She then proceeded to yell at him with an angry expression on her face, using aggressive, threatening mannerisms." Dkt. No. 371 at 25-26 (citations omitted). When brought to her supervisors attention, the incident was investigated and the allegation of psychological abuse was substantiated. *See id.* at 26. Defendant Maynes was terminated because of the incident. *See id.*

As a result of the March 25, 2011 incident, Defendant Maynes was charged with misconduct and incompetence by the CNYDDSO as follows:

> 1. On March 25, 2011, at approximately 2:38 pm, you hit individual M.S., while he was lying in his bed.

2. On March 25, 2011, at approximately 2:38 pm, you lunged toward individual M.S. in a menacing manner to frighten M.S. before you put on his underwear.

Dkt. No. 375-3 at 1-2. CNYDDSO suspended Defendant Maynes as a result of the charges and recommended that she be terminated. *See id.*

In the subsequent arbitration proceeding, the arbitrator sustained the allegation of psychological abuse, but not the allegation of physical abuse. *See id.* at 2. In making her findings, the arbitrator described the conduct at issue as follows:

> The camera was activated by motion within its range. The video shows an interaction between Grievant and M.S. for a period of approximately two minutes. At the outset, Grievant has approached the side of the bed on which M.S. is lying. She brings her raised arm down fast and hard either onto the bed or onto Grievant, who has been shown on a slightly earlier clip as lying down on the bed. Because the camera angle is too high to show the bed itself, it is impossible to conclude with the requisite degree of certainty that Grievant struck M.S. On this basis, Specification 1 cannot be sustained. It is clear that Grievant was striking something, however, so I conclude she was striking the bed. . . .
>
> Throughout the approximately two minute period Grievant is on the video, she is clearly very angry at M.S., speaking with an angry expression on her face and gesticulating much of the time she is on camera. The video begins with her hitting the bed hard, as stated above. She then quickly throws a blanket back, presumably off of M.S. M.S. then rises to a sitting position on the edge of the bed with his back to the camera. Grievant disappears off screen and returns with what appears to be an adult diaper. She approaches Grievant and thrusts her face toward him with arms back in an angry and threatening manner, speaking angrily. She then partially puts this undergarment on M.S., who is sitting on the edge of the bed. She then makes several trips to the closet, getting other clothing for M.S, partially putting them onto Grievant who is still seated on the bed, and taking away from the floor the underclothes and pants M.S. had earlier taken off. She then leaves, speaking with an angry expression one last time to M.S. before she does so.

Dkt. No. 375-3 at 3. The arbitrator also noted that Michael appeared calm during the entire incident and that Defendant Maynes could not recall what had frustrated her on the day in question. *See id.* Further, the arbitrator indicated that Defendant Maynes showed no remorse for her "obvious misconduct" and failed to provide an explanation. *See id.* at 4. As such, the arbitrator decided that termination was appropriate. *See id.*

Plaintiffs rely largely on the case *West v. Whitehead*, No. 04-cv-9283, 2008 WL 4201130 (S.D.N.Y. Sept. 11, 2008), in support of their position. *See, e.g.*, Dkt. No. 371 at 26. In *West*, the plaintiff was a non-verbal individual with "profound-range mental retardation" who resided in a residence for developmentally disabled individuals. *See West*, 2008 WL 4201130, at *1. Although the plaintiff was non-verbal, she could vocalize by making an "aaying" sound at times. *See id.* Further, the plaintiff sometimes demonstrated aggressive and self-injurious behavior, which was largely controlled by psychotropic medications. *See id.* Due to the plaintiff's disabilities, she was unable to protect herself from abuse or peer aggression, or to communicate or report abuse, discomfort, fear, injury, or illness. *See id.* The plaintiff alleged that throughout her ten years as a resident she was subjected to numerous incidents of abuse and neglect, and that her constitutional rights were violated. *See id.* In one such incident, the plaintiff was in a van with several employees of the home. *See id.* at *4. The plaintiff was "aaying" very loudly and the defendant asked one of the other employees, "'[w]here is the brush?'" *Id.* Upon seeing the brush, the plaintiff "became quiet" and crossed her arms. *See id.* The defendant's supervisor later reported that, upon seeing the brush, the plaintiff "'stopped aaying and flinched and immediately sat back and away. While [the plaintiff] did this[,] she took her arms and wrapped them around her.'" *Id.* Further, the supervisor noted that, while the defendant did not hit the plaintiff with the brush, it appeared that she was afraid of it. *See id.* at *5. Moreover, the plaintiff also alleged that,

41

on several occasions, the defendant tied a bib around her face, between her nose and mouth. *See id.* at *6. Finally, the most serious allegation involved the claim that the defendant beat the plaintiff with a clothes hanger. *See id.* at *7. Although no one witnessed the actual alleged abuse, bruises were observed on the plaintiff's body, and the defendant, who was one of two employees working the shift, had spent several hours alone with the residents of the home before the bruises were first noticed. *See id.* at *7-*9.

The plaintiff filed suit, alleging that the defendant violated her liberty interest in freedom from physical, psychological, and emotional harm by carrying out "the alleged hairbrush, bib, and hanger incidents, in addition to speaking to [the plaintiff] in a harsh and punitive manner on numerous occasions." *Id.* at *16. Denying the defendant's motion for summary judgment, the court first found that the plaintiff, as someone in the state's care, had a liberty interest in reasonably safe conditions and freedom from physical, emotional, and psychological harm, as well as freedom from excessive force unjustified by any legitimate governmental purpose. *See id.* at *18 (citations omitted). As to the second element, the court found that "a reasonable jury could conclude – taking into consideration Plaintiff's vulnerable state, her complete dependence on the BRH staff members, and her inability to defend herself or report any abuse that she suffers – that any conduct which takes advantage of these facts and causes her substantial harm shocks the conscience, and therefore, violated Plaintiff's constitutional rights." *Id.* Further, the court held that a reasonable jury could conclude that the defendant's alleged conduct was carried out only for the purpose of causing harm, that there existed no legitimate governmental purpose for the conduct, and that the conduct caused the plaintiff to suffer substantial physical and psychological injury. *See id.*

In the present matter, the Court agrees with Plaintiffs that questions of fact preclude the Court from granting Defendant Maynes' motion for summary judgment. The Court has reviewed the video of the March 25, 2011 incident and finds that the arbitrator's decision provides an accurate description of the event. Although the arbitrator did not sustain the allegation of physical abuse because of the video angle, the Court finds that a reasonable jury could conclude that Defendant Maynes struck Michael out of malice, as opposed to Michael's bed as Defendant Maynes contends. Further, although there is no audio, the video clearly shows Defendant Maynes angrily/aggressively addressing Michael and approaching him in a threatening manner. A reasonable jury could conclude that this conduct violated Michael's constitutional rights to be free from excessive force and physical, psychological, and emotion harm. *See West*, 2008 WL 4201130, at *17-*19.

Based on the foregoing, the Court denies Defendant Maynes' motion for summary judgment as to the March 25, 2011 incident.

### ii. Medication errors, wrist splint application, and failure to report

In their interrogatory responses to Defendant Maynes, Plaintiff asserted that "under her supervision, Defendant Maynes and her co-workers were responsible for twenty-five medication administration error, eleven Report Instances of Staff Abuse and/or Neglect . . . , seventeen emergency room admissions, and hundreds of serious injuries, which directly affected Michael[.]" Dkt. No. 242-10 at 1. Of all of the alleged violations, Plaintiffs only specifically identify Defendant Maynes as being personally involved with the following: (1) Defendant Maynes failed to report for ten days an incident where Defendant Graham sat on Michael's lap; (2) a medication error on February 3, 2009 where Defendant Maynes gave Michael his medication with water that

43

did not have "Thick-it;" (3) a medication error on March 11, 2011 where Defendant Maynes gave Michael his medication without liquid; and (4) Defendant Maynes failed to apply Michael's wrist splint on February 17 and 19, 2011. *See id.* at 4-6.

Since Plaintiffs have failed to provide any evidence that Defendant Maynes was personally involved in any alleged violations other than those specifically listed above, they are subject to dismissal. In fact, for most of the allegations, Defendant Maynes has provided evidence establishing that she was either not working or that they occurred after she was terminated from Fravor Road or that she was simply not involved in the alleged conduct. *See* Dkt. No. 242-1 at 15-19.

As to the specific alleged violations listed above, the Court finds that the conduct is not arbitrary, conscience shocking, or oppressive. As discussed, on June 27, 2008, Defendant Graham allegedly sat on Michael's lap, pointed her finger at his nose, and "declared 'I fucking hate you. You are so bad.'" Dkt. No. 371 at 33. Defendant Maynes witnessed this incident but did not report it until July 7, 2008. *See* Dkt. No. 242-1 at 22. During the investigation of this event, Defendant Maynes was asked why she did not immediately report the incident, to which she indicated that she had just started working at Fravor Road and because Defendant Graham was her direct supervisor. *See* Dkt. No. 242-15 at 10, 12. Defendant Maynes further stated that Defendant Graham spoke to Michael in a "'normal speaking voice'" and she did not appear to be "angry, upset or out of control." *Id.* at 10. Further, Michael did not appear to be upset or fearful during the incident. *See id.* Given the totality of the circumstances, Defendant Maynes' delay in reporting this incident does not shock the conscience. *See Lombardi*, 485 F.3d at 82 (citations omitted).

As to the two alleged medication errors which are attributable to Defendant Maynes, again such allegations fail to support a due process claim. *See Lee v. Richland Parish Detention Ctr.*, 483 Fed. Appx. 904, 905-06 (5th Cir. 2012) (holding that the plaintiffs "allegations of a few instances of delay or error in administering his medicine and in meeting his dietary needs establish, at most, a disagreement with his treatment, unsuccessful treatment, or negligent treatment, and do not amount to a constitutional violation") (citations omitted). Similarly, the alleged failures to apply Michael's wrist splint are insufficient to impose liability under the Fourteenth Amendment. *See id.* at 905 (dismissing the plaintiff's due process claim because he failed to show that any of the instances of delayed medical treatment was done with "subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn") (citation omitted).

Based on the foregoing, the Court grants Defendant Maynes' motion for summary judgment as it applies to the alleged medication errors, wrist splint application, and failure to report.

### 6. Defendant Cora Spencer

Plaintiffs contend that, "[o]n two occasions in late February 2011, for no justifiable reason, Spencer pushed and shoved Michael out of his room." Dkt. No. 371 at 28. On another occasion, Plaintiffs assert that, in violation of Michael's behavior plan and in contravention of generally accepted protocol, Defendant Spencer placed a laundry basket over Michael's head. *See id.* Moreover, Plaintiffs argue that Defendant Spencer "verbally intimidated and berated Michael (and other residents) on a constant basis using offensive language and an aggressive, threatening tone." *Id.* Further, Plaintiffs claim that, on at least two occasions, Defendant Spencer

"intentionally unplugged Michael's radio, thus depriving him of a therapeutic sensory device, and also kept a box of Michael's other sensory items locked away while other residents' sensory devices were readily available to them." *Id.*

### i. The "shoving" incident

Plaintiffs contend that on two instances in February of 2011, Defendant Spencer "pushed and shoved" Michael out of his room. *See* Dkt. No. 371 at 28; *see also* Dkt. No. 251-24. Defendant Spencer, however, contends that the video clearly shows that she was simply guiding Michael out of his room. *See* Dkt. No. 409 at 14. Further, Plaintiffs argue that the Court "may not resolve this quintessential factual question on this motion and, instead, should accept plaintiffs' interpretation of the video depicting these incidents." *Id.* at 29. The Court disagrees.

Similar to Plaintiffs' allegations regarding the video of Defendant Finster allegedly slapping Michael, the Court finds that Plaintiffs have grossly exaggerated/misrepresented this alleged incident. The Court has reviewed the videos of the alleged incidents and agrees with Defendant Spencer that they simply depict her guiding Michael into or out of his room by placing her hand on the small of his back. *See* Dkt. No. 251-24. In fact, the New York State Trooper who investigated the alleged incident concluded that "it appears that [Spencer and Dawn Bixler] are either directing Michael into or out of his room" and that their actions "do not appear criminal." Dkt. No. 251-31 at 13. Far from criminal, the alleged "shoving" depicted on the video is something that no reasonable jury could conclude is conscience shocking. *See Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) (granting summary judgment where the alleged use of force was "de minimis" and "benign"); *House v. Wackenhut Servs., Inc.*, No. 10 Civ. 9476,

2012 WL 4017334, *24 (S.D.N.Y. Aug. 20, 2012) ("If the video is plaintiff's only evidence of malice, there is no evidence of malice, because the video proves nothing").

Accordingly, the Court grants Defendant Spencer's motion for summary judgment as to the alleged "shoving" incident.

### ii. Wrist splint and medication issues

As discussed above, Michael's Residential Habilitation Plan provided that he should wear his wrist splint during the day for a minimum of fifteen minutes per hour and a different hand splint throughout the night. *See* Dkt. No. 251-25 at 3. The videos upon which Plaintiffs rely in support of this claim are all less than two minutes in length and are insufficient to establish that Michael's plan was not being complied with. Further, there are approximately ten dates starting in February of 2011 through April of 2011 that Plaintiffs allege show Michael without his wrist splint on. *See* Dkt. No. 389-1 at ¶¶ 324-343. The time sheets for Defendant Spencer, however, conclusively demonstrate that she was not working during those ten days and/or times alleged. *See id.* As such, Defendant Spencer was not personally involved in these alleged incidents. *See Wright*, 21 F.3d at 501. The few remaining instances which can be attributable to Defendant Spencer do not rise to the level of a substantive due process violation.

Plaintiffs also claim in their Counterstatement of Material Facts that Defendant Spencer "failed to administer Michael's medication as prescribed" on several occasions either through the use of non-thickened liquid or entirely without the aid of liquid. *See* Dkt. No. 409-1 at ¶¶ 11, 14. These isolated incidents, in which Defendant Spencer is actually making sure that Michael received his medication, just not in the exact manner prescribed, are patently insufficient to support the alleged substantive due process violation.

### iii. Unplugging Michael's radio

Plaintiffs contend that, on several occasions, Defendant Spencer unplugged Michael's sensory devices, which were caught on video. *See* Dkt. No. 409-1 at ¶¶ 22-24, 29-30. In addition to the instances caught on video, Plaintiffs claim that Michael's radio and other sensory items were either removed from his room, not working, or unplugged. *See* Dkt. No. 389-1 at ¶¶ 417-19. Although Plaintiffs admit that Mary-Anne Surlock's journal indicates that employees other than Defendant Spencer were working at the time these incidents were discovered, Plaintiffs deny the allegation that Defendant Spencer was not involved with any of these incidents. *See id.* Specifically, Plaintiffs contend that the "dates stated are often dates when acts of retaliation were *discovered* and the act may have occurred one or more days prior to the discovery by the Surlocks." *Id.* at ¶ 417.

Plaintiffs' speculation that Defendant Spencer was somehow personally involved in the incidents that they did not witness is insufficient to withstand the pending motion. As to the incidents caught on video in which Defendant Spencer is seen unplugging the radio, these isolated incidents are also insufficient to withstand summary judgment. Nothing in the record indicates that these acts were done with malice or that Michael was harmed in any way from these isolated incidents. Under any of the standards set forth above, the allegations and evidence submitted in support thereof are insufficient to support a substantive due process claim.[17]

---

[17] According to Defendant Finster, when staff started to suspect that they were being recorded on video, they unplugged items such as Michael's radio, thinking that the recording device might be located within them. *See* Dkt. No. 375-8 at 2.

Based on the foregoing, the Court grants Defendant Spencer's motion for summary judgment as to these allegations.

### iv. Duty to protect Michael from harm

Although Plaintiffs admit that Defendant Spencer was not a supervisor, they contend that she nevertheless had a duty to monitor and care for all residents and to protect them from harm. *See* Dkt. No. 371 at 30-31. Plaintiffs claim that, despite this duty, "Michael suffered scores of injuries, many of which were self-inflicted." *Id.* at 31. In support of this assertion, Plaintiffs cite to three exhibits, with no pincite to specific pages within those exhibits. *See id.* (citing Exs. 6, 10, and M-38). Exhibit "6" is a 297 page document that Plaintiffs have entitled "Injuries Linked to FR Defendant Timesheets + BC + PRN." Dkt. No. 372-1; *see also* Dkt. No. 371-2 at 2. This handwritten document, appears to be a summary of injuries Michael sustained on various dates and provides who was working on the day in question. While in theory such a summary should be helpful, Plaintiffs fail to provide any meaningful citation to where in the record this information is actually found. Although it appears that Plaintiffs did attempt to make reference to the underlying documents used to generate the summary, they did so using what appear to be designations used by Plaintiffs' attorneys and are entirely unhelpful in locating the underlying documents. *See, e.g.*, Dkt. No. 372-1 at 3 (citing to, among other things, "Behavioral Data File S131104" and "Body Charts File DD7119"). It is neither the Court's nor opposing counsel's responsibility to scour the record in this case – which is thousands of pages – to determine whether such evidence actually exists. Plaintiffs also cite to Exhibit "10" which does not appear to exist. In fact, according to Plaintiffs' declaration, Exhibit "10" is entitled "(No Exhibit)." Dkt. No. 371-2 at 2. Plaintiffs' conclusory allegations, unsupported by any evidence that Defendant

Spencer was even present when these unspecified injuries occurred, is insufficient to withstand summary judgment on this claim.

Further, the only case upon which Plaintiffs rely in support of this conclusory argument is *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981). That case, however, discusses when officials in charge of an agency can be held liable for alleged Section 1983 violations. *See id.* at 141. As a non-supervisory official, the case is entirely inapplicable to Defendant Spencer.

Based on the foregoing, the Court grants Defendant Spencer's motion for summary judgment as to these allegations.

### v. Laundry basket incident and abusive language

Plaintiffs contend that, "in violation of Michael's behavior plan and in contravention of generally accepted protocol, [Defendant] Spencer placed a laundry basket over Michael's head." Dkt. No. 371 at 28. Further, Plaintiffs assert that Defendant Spencer "verbally intimidated and berated Michael (and other residents) on a constant basis using offensive language and an aggressive, threatening tone." *Id.* Defendant Spencer contends that, even assuming the truth of these allegations, they are insufficient to support a substantive due process cause of action.

According to Defendant Finster, while in the general living area with Defendant Spencer, Michael and the other residents, Michael began "acting up." Dkt. No. 375-6 at 3-4. In response, Defendant Spencer "put a laundry basket over his head to see if that would calm him down or something. And she took it back off, but Cora is kind of intimidating. . . . I didn't try to say too much around her, but I did mention it to Ron a different day." *Id.* at 4. Moreover, Defendant Finster testified that Defendant Spencer constantly used foul language directed at Michael and the

50

other residents. *See id.* at 4-5. For instance, she specifically recalled Defendant Spencer saying things such as "get your f-ing butt up, or go in the f-ing kitchen." *Id.* at 4.

As Plaintiffs correctly contend, considering the totality of the circumstances, the Court finds that a reasonable jury could find that this conduct violated Michael's substantive due process rights. Like the plaintiff in *West*, questions of fact exist as to whether the alleged verbally abusive and harsh manner, in addition to the laundry basket incident which was clearly not an approved manner in which to assist Michael when he was engaging in self-injurious behavior, violated Michael's liberty interest in being free from physical, psychological, and emotional harm. *See West*, 2008 WL 4201130, at *16-*18. Although Defendant Finster believed that Defendant Spencer placed the basket on Michael's head in an effort to calm him down, that belief could be rejected by the jury upon weighing her credibility. Rather, a reasonable jury could conclude that the conduct was not done in an effort to aide Michael, but was actually done maliciously or in an effort to cause Michael psychological harm. *See Shabazz v. Pico*, 994 F. Supp. 460, 475 (S.D.N.Y. 1998) (holding that, "[u]nder certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus*") (citation omitted). If the alleged conduct occurred as Plaintiffs claim, the Court finds that, taking into consideration Michael's vulnerable state, his complete dependence on the Fravor Road staff members, and his inability to defend himself or report such abuse, a reasonable jury could conclude that this conduct shocks the conscience. *See West*, 2008 WL 4201130, at *18. Indeed, a reasonable jury could conclude that Defendant Spencer's alleged conduct was carried out only for the purpose of causing harm, that there existed no legitimate government purpose for the conduct, and that the conduct caused Michael to suffer substantial psychological injury. *See Lewis*, 523 U.S. at 848 (stating that "conduct intended to injure in some way unjustifiable by any

51

government interest is the sort of official action most likely to rise to the conscience-shocking level").

Based on the foregoing, the Court denies Defendant Spencer's motion for summary judgment as to these allegations.

### 7. Administrative Defendants

Plaintiffs contend that Defendants Gleason, O'Brien and DiNuzzo (the "Administrative Defendants") "deprived Michael of his rights to be provided a reasonably safe environment and protected from harm, to be provided adequate medical care and minimal training and to be free from physical and psychological abuse and that their decisions which caused these deprivations departed substantially from prevailing professional standards or were otherwise deliberately indifferent to Michael's rights." Dkt. No. 371 at 50. First, Plaintiffs claim that "by failing to provide Michael the level of supervision he required, these defendants failed to protect Michael from his own self-injurious behavior." *Id.* (citation omitted). According to Plaintiffs, it is undisputed that the Administrative Defendants had knowledge of the seriousness of Michael's self-injurious behavior and the severe physical injuries he sustained as a result thereof. *See id.* (citing Exs. 2, 4, 6-8). Further, Plaintiffs contend that, "over the years, Michael's parents, his Medicaid Service Coordinators, OPWDD's Commission on Quality Care and even certain OPWDD employees working with Michael advised these defendants that Michael did not have adequate supervision at Fravor and required one-to-one care." *Id.* (citing Exs. 8). Plaintiffs argue that "despite having authority to act and awareness of the numerous requests from qualified professionals that they do so, and despite their awareness of the substantial risk of serious injury to Michael, these defendants repeatedly refused to even attempt one-to-one care." *Id.* at 51 (citing

Ex. 8). "Instead, in December 2009, the Administrative Defendants, in conjunction with Michael's treatment team, decided to provide Michael 'enhanced staffing' on Saturdays and holidays only. . . . This limited measure provided line-of-sight supervision of Michael by a dedicated staff member throughout the day." *Id.* at 51-52 (citing Ex. M-60). According to Plaintiffs, this limited measure proved ineffective, and the repeated requests for one-to-one care by themselves and others were again denied. *See id.* at 52.

As the Administrate Defendants correctly contend, the vast majority of citations to the record that Plaintiffs provide simply do not support their allegations. For example, Plaintiffs repeatedly argue that the van used to transport Michael was unsafe and that, despite being informed of this, they "still failed to take reasonable measures to protect Michael and provide him with an adequately safe environment during transport." Dkt. No. 415-8 at ¶ 13 (citations omitted). The exhibits to which Plaintiffs cite, however, demonstrate the lengths to which the Administrative Defendants went to ensure that Michael was transported safely and to address the demands of his parents. For example, in a series of emails, Joyce Flynn discusses the fact that she spoke with two separate contractors regarding replacing the seat in the transport van to better ensure Michael's safety during transport and to prevent any injuries that might occur if Michael engages in self-injurious behavior during transport. *See* Dkt. No. 382-1 at 60-61 (Ex. A-167). The email recounted Ms. Flynn's conversation with Mr. Surlock regarding the available options and indicated that it was a productive conversation and that Mr. Surlock "expressed thanks" for the call. *See id.* Far from supporting Plaintiffs' claim, the evidence demonstrates that the Administrative Defendants took immediate action on Mr. Surlock's concerns about safely transporting Michael in the van. Moreover, even assuming that the Administrative Defendants

failed to take these steps as alleged, Plaintiffs fail to provide any evidence that Michael suffered any injury as a result of the alleged nonfeasance.

Moreover, Plaintiffs also claim that "[o]n Wednesday, February 18, 2009, plaintiffs expressed concerns regarding Michael's care. Instead of attempting to correct the numerous problems that Michael faced, Defendant Gleason suggested that Michael be moved to a new home." Dkt. No. 415-8 at ¶ 14. The only evidence cited in support of this claim is an entry from Mrs. Surlock's journal. *See* Dkt. No. 382-1 (Ex. A-170). This journal entry provides as follows:

> Had meeting at 6:00 p.m. at DSO in Syracuse with John Gleason [and] Tony DiNuzzo. Lasted about 2hr 20 minutes. They seemed to listen to us and agreed things did not go right, right from day one. John felt that Laurie should not be involved with us. He suggested a new psychiatrist [and] he would have him get in touch with us. Asked if we wanted Michael moved to a new house. Suggested a few homes in Camden that he felt would be good for Michael but there are no openings as of this time. He said we could go [check] them out anytime we wanted to.
>
> I did feel like they wanted to end the meeting [and] we still had things to talk about.
>
> At morning DSO meeting Donna again tells Brad Michael has a dental [appointment] on March 5th but she's not sure of the time – will get back to us.

Dkt. No. 382-1 at 67-68 (Ex. A-170). This journal entry does not identify any specific concerns Plaintiffs expressed that Defendants Gleason and DiNuzzo failed to address. Rather, it demonstrates that Defendants Gleason and DiNuzzo spent a considerable amount of time – two hours and twenty minutes – in an attempt to allay Plaintiffs' concerns regarding Michael's care. Further, in Mrs. Surlock's own words, Defendant Gleason offered Plaintiffs the option of moving Michael to one of a few homes, which "he felt would be good for Michael[.]" *Id.*

Contrary to Plaintiffs contentions, the undisputed facts in this case demonstrate that the Administrative Defendants actively participated in Michael's care, provided thorough oversight, and were responsive to concerns that were brought to their attention. The record clearly demonstrates that the Administrative Defendants constantly fielded calls, letters, and emails from the Surlocks, sometimes on a daily basis. Once Michael's BMP, IPOP, and other care plans were developed and implemented, CNYDDSO was inundated with calls, letters, and complaints from the Surlocks regarding every aspect of Michael's care, from minor details such as whether his bed was made and his laundry done properly, to more concerning issues of injuries and medication errors. Further, the record is replete with instances in which Plaintiff Bradford Surlock would complain to a supervisory official about some aspect of Michael's care, treatment, or interaction with staff. Then, without giving that supervisor any time whatsoever to remedy the situation or even investigate, he would proceed to complain to someone else in the agency's hierarchy. *See, e.g.*, Dkt. No. 383-1 at 18-19. For example, on February 17, 2010, Defendant Gleason spoke directly with Mr. Surlock regarding some of his concerns, which Defendant Gleason assured him that he would look into. *See id.* at 25. Defendant Gleason also told Mr. Surlock that, after investigating his concerns, he would be back in touch with him to set up a time to meet with him, which his secretary attempted to do that same day. *See id.* However, following Defendant Gleason's conversation with Mr. Surlock, and before permitting him time to attempt to follow up as agreed, Mr. Surlock proceeded to call Defendant O'Brien and voiced the same concerns. *See id.* According to the email, Defendant O'Brien was forced to terminate the call after Mr. "Surlock refused to stop screaming into the phone, calling her names, and belittling her every attempt to have a reasonable conversation about the issues." *Id.* Thereafter, still on February 17, 2010, Mr. Surlock attempted to call Ceylane Meyers, who is listed as a client advocate with OPWDD. *See*

*id.* at 26. Although Ms. Ceylane was unavailable that day, Bertha Moore reported that, upon informing her about all of his complaints, which had just been relayed to Defendants Gleason and O'Brien, Mr. Surlock asked that Ms. Ceylane call him back and also indicated that "he is ready to talk to the papers to express his anguish and frustration over the care and lack of response he is receiving from the DDSO." *Id.*

Plaintiffs are correct that the suggestion was made that Michael and staff would benefit from 1:1 staffing for Michael and that this was not implemented. *See* Dkt. No. 382-2 at 87. The record, however, clearly demonstrates that, in light of this recommendation and the Administrative Defendants' recognition that Michael needed more staff attention, several changes were made. *See id.* First, several changes at Fravor Road helped increase the staff-to-patient ratio. *See id.* For example, they increased staff during the evening shift, "which was specifically done for Michael." *Id.* Also, an additional nurse was hired in January of 2009. *See id.* Further, when another patient was moved to a different facility, Defendant O'Brien decided to keep that bed vacant, thereby reducing the number of patients residing at Fravor Road to nine. *See id.*; *see also* Dkt. No. 383-1 at 20-24.

Further, other staff, including Defendant Alexander, indicated in an email to the Administrative Defendants that "Michael having a 1:1 staff is not necessarily the answer." Dkt. No. 383-1 at 7. Defendant Alexander further expressed the belief that even if Michael was provided with 1:1 staff, it would not necessarily prevent Michael from injuring himself when he engages in self-injurious behavior and there would still be injuries for which the staff could not explain. *See id.* at 7-8. Defendants O'Brien and Elliott similarly expressed the opinion that 1:1 staffing would not prevent Michael from hurting himself when he engages in self-injurious behavior. *See* Dkt. No. 374-1 at 62. As such, the Administrative Defendants' failure to acquiesce

to this request can hardly be said to constitute a substantive due process violation. Rather, this was a mere disagreement as to the appropriate treatment that Michael should receive. Moreover, in a letter to Defendant Gleason on September 14, 2009, Michael's Medicaid Services Coordinator ("MSC") Caitlin Prior noted that Michael's care was already "virtually one on one" and that "his behaviors need to be dealt with in another way[.]" Dkt. No. 374-1 at 16. In a follow-up letter dated September 25, 2009, Ms. Prior suggested that 1:1 staffing **or** downsizing the home would be beneficial to Michael. *See id.* at 17 (emphasis added).

Additionally, the undisputed facts clearly demonstrate that the Administrative Defendants spent extraordinary amounts of time attempting to address the Surlocks's concerns. For example, soon after Michael first moved into the Fravor Road facility, Defendant O'Brien, along with members of Michael's care team, held weekly meetings with Plaintiffs Bradford and Mary-Anne in an attempt to facilitate better communication between the Surlocks and the staff, and to work together to ensure that Michael was receiving care and treatment to everyone's satisfaction. *See, e.g.*, Dkt. No. 382-1 at 103. Such conduct can hardly be said to be conscience shocking or acting with deliberate indifference.

Plaintiffs rely on their expert, Mark Levine, in support of their contention that "the prevailing standards of professional judgment require the decision maker to be proactive and not just reactive and that the Administrative Defendants here substantially departed from this standard. . . . More specifically, Levine explained that, if certain measures proved ineffective, the exercise of professional judgment requires the decision maker to try a different approach." Dkt. No. 371 at 52; *see also* Dkt. No. 371-7 at 17. However, as discussed, Michael's care team, with the Administrative Defendants' oversight, continually reviewed and revised Michael's behavior

and treatment plans. This occurred not merely on a regular basis, but also in response to issues as they arose.

The record clearly demonstrates that the Administrative Defendants, along with Michael's care team, repeatedly revised Michael's treatment plan, largely based on suggestions/demands made by the Surlocks. Despite tension between the Surlocks and Fravor Road staff, the team members continued to ensure that the Surlocks' input was solicited and acted upon. For example, starting in October of 2009, the care team developed a revised "toileting plan" "after lengthy input from both parents, OT, and Psychologist." Dkt. No. 382-2 at 104. In an email from Defendant O'Brien to the other Administrative Defendants, as well as members of Michael's care team, Defendant O'Brien directed that the "clinical staff will ensure that Mr. Surlocks [sic] input is included, and that he supports the plan before it is implemented." *Id.* This toileting plan, which required staff to prompt Michael to use the bathroom every forty-five minutes, was implemented at the Surlocks' insistence, and required staff to prompt Michael to use the bathroom considerably more frequently than the toileting schedule for the other residents, who required prompting about every two hours. *See id.* at 105. Despite the concessions, the Surlocks were still not entirely satisfied with the new plan because they wanted language added that, in the event that Michael did not go to the bathroom at the forty-five minute interval, staff must retry at fifteen-minute intervals until he goes to the bathroom. *See id.* at 107. Although the language was not specifically included, staff indicated that fifteen-minute retry "was likely but could not be guaranteed" because of their other responsibilities. *See id.* These allegations clearly fail to support a substantive due process claim.

Moreover, Michael's care/treatment team and Defendant O'Brien spent considerable amounts of time discussing how best to ensure that Michael stayed safe when he engaged in self-

58

injurious behavior. During an August 12, 2010 meeting, the care team proposed potentially locking Michael's bedroom door at certain times during the day to prevent him from entering the room because the majority of his self-injurious behavior occurred in the bedroom. *See* Dkt. No. 374-1 at 40-42. Although Mrs. Surlock believed that this was an idea worth trying, Mr. Surlock opposed the idea and remained steadfast in his position that the only appropriate course of action was to provide Michael with 1:1 staffing. *See id.* The staff explained to Mr. Surlock that, even with 1:1 staffing, the assigned staff member would not follow Michael into his bedroom at all times, only when assisting him with tasks or when they observe that he is about to engage in self-injurious behavior. *See id.* at 43-44. Further, Defendant O'Brien inquired whether the Surlocks would oppose if they requested to put a video camera in Michael's room so that staff would be able to hear some of the telltale signs that generally occurred prior to episodes of self-injurious behavior. *See id.* at 45. Although indicating that it was not a perfect solution, Mrs. Surlock was receptive to the idea. *See id.* Mr. Surlock, however, indicated that "[p]utting a little monitor in his room is unacceptable" and remained insistent in his view that the only acceptable solution was to provide Michael with 1:1 staffing. *See id.*

Moreover, when Defendant O'Brien first assumed oversight for Oswego County, she had a meeting with the Surlocks at their home which lasted for approximately three hours. *See* Dkt. No. 383-1 at 3. Defendant O'Brien assured them that she would look into some of the past events that were of concern to them, but tried to get them focused on moving forward and working in a more positive way with staff to ensure Michael is provided will all that he needs. *See id.* According to Defendant O'Brien, the following is an outline of what she had in mind and "loosely discussed with the family:"

1. I will look into the past issues.  I asked them to refrain from bringing up past concerns with the team, in order to be more focused on moving forward.

2. End the Wednesday meetings.  It has become a free for all attack session, and not one that I feel worthy of supporting.

3. Instead meet only as needed to work on specific issues, such as the toileting schedule plan, and other issues as they come up.  Any meetings will have ground rules such as respected listening.

4. I will work with the team to develop a more positive interaction style, and coping strategies for working with this family.

5. The MSC will be a partner in developing teamwork.

Dkt. No. 383-1 at 3-4.

Finally, the record demonstrates that the Administrative Defendants engaged in extensive investigations and reviews when alleged errors or inadequacies were brought to their attention. *See, e.g.*, Dkt. No. 383-1 at 29-41.  These investigations led to improvements and changes to help ensure that Michael received the care he needed.  *See id.*  In fact, in a seven-page letter dated April 17, 2010 from Mary-Anne Surlock to Defendant Gleason, Mrs. Surlock rehashes many of the perceived slights, incidents of staff being rude to her and her husband, and alleged inadequacies in Michael's care and treatment that had been the focus of many past discussions. *See* Dkt. No. 383-1 at 42-48.  After rehashing these past events, Mrs. Surlock concludes the letter as follows: "John, I feel that you are a good man, dedicated to your job.  I know you are a very busy man but when we have come to you in the past you do seem to care and help to get things done.  I can't help but feel that you may not know all the details of the problems.  On several occasions when Brad spoke to you on the phone with regard to a problem you never once thought . . . they were unreasonable requests.  I do hope we can keep the doors open and move beyond these problems."  *Id.* at 47-48.

The undisputed facts clearly demonstrate that the Administrative Defendants exercised their professional judgment as administrators of OPWDD in making decisions about what was in the best interests of residents and staff. Through the Administrative Defendants' oversight, with the input of Michael's program team and his parents, issues involving both safety and programming were developed, decided, authorized, and managed with oversight provided by the Behavior Management Committee ("BMC"). Additionally, Defendants authorized the use of restraining devices and medication, including helmets, psychotropic drugs, straps, restraints, and other restraining measures were implemented and repeatedly revised to address Michael's needs. Further, the Commissioner's Committee for Review of Restrictive Interventions ("CRC") oversaw the use of Michael's safe chair. When the CRC declined to extend authorization for use of the safe chair because of the progress Michael was showing and the reduced need for its use, Plaintiffs appealed the decision, which was affirmed by the Commissioner of OPWDD. *See* Dkt. No. 418 at 10; Dkt. No. 415-2 at ¶¶ 62-63.

In the decision denying their appeal to the Commissioner regarding the reduced use of the safe chair, the Commissioner found that Plaintiffs "offered no evidence to show where and when each injury was sustained by Michael, and thus failed to establish that the injuries were the result of the use of the less restrictive methods being used by Fravor IRA. Mr. Faber testified that most of the injuries sustained by Michael occurred outside the Fravor residence while he was attending a day program at a private agency, a fact which was not contested by appellants." Dkt. No. 377-32 at 6. Moreover, in response to Plaintiffs' argument that Michael's behaviors improved over time, thereby justifying the reduced use of the safe chair, the Commissioner noted as follows:

However, as previously discussed, the BP[18] with the implementation date of October 15, 2011 references the progress that Michael has made with regard to the decreased use of the safe chair and the increased use of the safe area and bean bag chair. In its November 15, 2011 letter, the CCRII, having reviewed the current BP, concurred that improvements toward the goal of fading use of the safe chair had been demonstrated. In fact, all of the letters from the CCRII entered into the record, dating back to 2009, and the Bps dating back to 2010, called for fading use of the safe chair and recommended continued efforts in the use of less restrictive methods to assist Michael in calming himself. The safe chair has been recommended for use as a last resort, if other methods are not successful in calming Michael during a SIB episode. The safe chair has consistently been approved for use by the CCRII in accordance with these plans and the plans are consistent with therapeutic, clinical, safety and regulatory requirements and goals.

Dkt. No. 377-32 at 6. Finally, the Commissioner held that reducing the use of the safe chair was supported by credible evidence, and indicated that

the evidence at the hearing shows that the methods implemented have had positive results. According to the 2011 BP, the episodes of SIB have decreased, there have been no major injuries in over a year, and as a result, there has been a decreased need for use of the safe chair. It is the consistent policy of OPWDD that the least restrictive intervention methods always be used, when appropriate. This includes the use of the bean bag chairs and a safe area, as prescribed in the plans presented.

*Id.*[19]

The decision to reduce the use of the safe chair, along with a majority of the other complaints discussed above, demonstrate that the Surlocks simply disagreed with the professional

---

[18] Behavior Plan.

[19] As the Administrative Defendants correctly contend, they are also entitled to summary judgment relating to any claims that they caused the removal or limited use of Michael's safe chair because they were not personally involved in the decision. The evidence clearly demonstrates that the decision was made by the Commissioner's Review Committee on Restrictive Interventions and it was upheld by Courtney Burke, who was then the Commissioner of OPWDD. *See* Dkt. No. 415-2 at ¶ 65.

opinions regarding the appropriate treatment methods for their son. Such disagreements, do not constitute deliberate indifference. *See Chance*, 143 F.3d at 703. When a person is institutionalized or living in state care like Michael and wholly dependent on the state, a duty to provide certain services and care exists. Although such a duty exists, the state "necessarily has considerable discretion in determining the nature and scope of its responsibilities." *Youngberg*, 457 U.S. at 317 (citing *Richardson v. Belcher*, 404 U.S. 78, 83-84 (1971); *Dandridge v. Williams*, 397 U.S. 471, 478 (1970)). Despite the Surlocks' disagreements over the treatment and care Michael received, the undisputed facts demonstrate that Michael's incidents of self-injurious behavior decreased over time as a result of the modifications to his behavior plan, changes were made to enhance his level of supervision and to increase staffing at Fravor Road, and staff continually worked to become better equipped to manage Michael's challenging behaviors. As the Administrative Defendants note, the fact that the safe chair was ultimately ordered discontinued is evidence that Michael's self-injurious behavior was improving, even in the absence of the strict one-on-one supervision the Surlocks' demanded. Far from deliberate indifference, the evidence demonstrates that the Administrative Defendants provided an incredible amount of supervision and were very responsive to the issues that arose. Although mistakes were undeniably made at various times, the Administrative Defendants were not responsible for these incidents and, when brought to their attention, they acted in a timely manner to ensure that the matter was appropriately handled.

Based on the foregoing, the Court grants the Administrative Defendants' motion for summary judgment as to Plaintiffs' substantive due process claim.

### 8. The Nurse Defendants

Plaintiffs contend that the Nurse Defendants had an affirmative obligation to provide Michael reasonably adequate medical care and to protect him from harm. *See* Dkt. No. 371 at 35. Further, Plaintiffs argue that they had a supervisory obligation to ensure that their subordinate staff were providing adequate care to Michael. *See id.* Despite these obligations, Plaintiffs claim that "the record demonstrates that these defendants substantially departed from prevailing professional standards or were otherwise deliberately indifferent to Michael's rights and, as a result, Michael was harmed and put at substantial risk for significant medical complications and injuries." *Id.*

In support of this claim, Plaintiffs assert that, "during their respective tenures as the supervising Fravor Road nurse, Motyka's staff was responsible for at least thirteen medication errors, . . . Reynolds' staff was responsible for at least three medication errors, . . . and Dickerson's staff was responsible for twenty-one medication errors." *Id.* (citing M-31).[20] According to Plaintiffs' expert, based on the inadequacy of the record-keeping and reporting processes the Nurse Defendants followed, the actual number of medication errors over this time frame is likely higher. *See id.* Moreover, Plaintiffs contend that a reasonable jury could find that Michael's substantive due process rights were violated through Defendant Motyka's failure to suspend or counsel any of the direct care staff despite the repeated documented medication errors. *See id.* at 36-37.

In their reply, the Nurse Defendants generally concede personal involvement regarding the allegations pertaining to their training and oversight of medication administration. *See* Dkt. No.

---

[20] The Court notes that Plaintiffs cite to Exhibit "M-31" in support of this assertion. *See* Dkt. No. 371 at 35. This exhibit, however, is simply a summary of alleged medication errors created by either Plaintiffs' counsel or Plaintiffs themselves, and provides no indication as to where this information is actually contained in the record.

414 at 6-7; *see also* Dkt. No. 253-4 at 8. They note, however, that Plaintiffs' response relates "solely to the Nurse Defendants' oversight of medication administration; no other conduct by the Nurse Defendants is implicated." Dkt. No. 414 at 7. As such, the Nurse Defendants argue that because "Plaintiffs do not address the other allegations previously raised, the Court should therefore consider them abandoned." *Id.* The Court agrees. Plaintiffs' response only addressed the Nurse Defendants' alleged responsibility for the medication administration errors. As such, the Court finds that Plaintiffs have abandoned all substantive due process claims against the Nurse Defendants except for those relating to the alleged medication administration failures. *See Jackson v. Federal Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) (holding that, where a party is represented by counsel and files a partial response to a motion for summary judgment, *i.e.*, referencing some claims or defenses but not others, the court may deem abandoned those claims or defenses that are not defended); *Howard v. City of New York*, 62 F. Supp. 3d 312, 324 (S.D.N.Y. 2014) (same). This result is particularly appropriate considering the amount of time Plaintiffs spend in discussing the alleged medication administration failures and the lack of any indication in the record that the Nurse Defendants were in any way personally involved in the numerous other allegations supposedly supporting Plaintiffs' substantive due process claims.

Plaintiffs incorrectly assert that Defendant Motyka failed to suspend or counsel any of the direct care staff in response to medication errors. On February 3, 2009, Defendant Maynes was observed giving Michael his final three pills with regular water after she ran out of thickened liquid, in violation of his care plan. *See* Dkt. No. 387-1 at 299. In response to this incident, Defendant Maynes was not permitted to accept the medication keys or pass medication until she was retrained by the supervising nurse (Defendant Motyka). *See id.* at 299-300.

Plaintiffs also take issue with the fact that Defendants Motyka and Dickerson's "responses to medication errors were entirely reactive, not proactive. The most they did was verbally counsel direct care staff on what that person did wrong and warn them not to make the same mistake in the future." Dkt. No. 371 at 38. Again, this statement is misleading. First, as required by the regulations, the Nurse Defendants were required to re-certify the direct care staff on a yearly basis so that they could continue to distribute medication to patients. Second, as discussed in more detail below, the Nurse Defendants did take additional steps in addition to "verbally counseling" the direct care staff. For example, when issues were brought to their attention, the direct care staff were retrained to avoid the issue in the future. Further, additional safeguards were put in place to ensure that when Michael's prescriptions would change (which occurred on a regular basis), all individuals responsible for distributing his medication would be aware. Third, the very nature of the alleged medication errors dictates that their responses would be "reactive, not proactive." As Defendant Motyka explained, one staff member would dispense the medication for the house, while another would distribute it to the patients. *See* Dkt. No. 254-4 at 100-01. Only after the medication has been distributed would the records be reviewed to ensure that the patients received their medication as prescribed. *See id.* Absent the Nurse Defendants following the direct care staff from patient to patient, observing each patient receiving his medication, each time medication was being distributed, the "proactive" response that Plaintiffs claim should have occurred would be impossible. Indeed, while Plaintiffs argue in a conclusory fashion that the Nurse Defendants should have been more "proactive" in dealing with medication errors, they fail to provide any example as to how such a proactive response would be possible.

Moreover, Mary-Anne Surlock admits that, when medication errors were discovered, the issues were discussed and the offending direct care worker was re-educated as to the proper

procedures to follow. *See* Dkt. No. 385-2 at ¶ 14. Plaintiffs complain that this re-education process was insufficient and that the direct care workers should have had their certification to administer medication suspended. Again, however, Mary-Anne Surlock admits that, in one instance where a direct care worker made four medication errors during the same shift, the Nurse Defendants did, in fact, suspend this worker's certification. *See id.*

Additionally, Plaintiffs deny in an entirely conclusory fashion that direct care workers were re-educated when medication errors were discovered. For example, the Nurse Defendants contend that, on May 5, 2012, it was claimed that the direct care staff failed to administer the proper dosage of Lamictal. *See* Dkt. No. 385-1 at ¶ 108. Further, according to the Nurse Defendants, Monique Dickerson "followed-up with the direct care staff and re-educated the staff on protocol including the three checks required for proper medication administration." *Id.* at ¶ 109. Plaintiffs deny that staff was re-educated, but only provide citation to a summary list of medication errors that Plaintiffs themselves created for this litigation. *See id.* (citing Ex. 1). This summary does not refute the fact that Defendant Dickerson re-educated direct care staff after this alleged error.

Further, it is alleged that, on May 28, 2010, direct care staff failed to administer a dose of Depakote. *See* Dkt. No. 385-1 at ¶ 71. Again, the Nurse Defendants contend that Defendant Dickerson followed up with the direct care staff and re-educated them on protocol, including the three checks required for proper medication administration. *See id.* at ¶ 72. In denying this allegation, Plaintiffs cite to the same summary of medication errors, as well as letters from the Commission seeking explanations and Fravor Road's response to the requests. *See id.* (citing Exs. N-38-48, N-51, and Ex. 1). Plaintiffs claim that these exhibits demonstrate "that the direct care staff was *not* re-educated." *Id.* (emphasis in original). These exhibits, however, repeatedly

indicate that the direct care staff was "re-trained on three checks and proper med administration protocols." Dkt. No. 385-4 at 99. Moreover, to address the concern that the direct care staff were not providing timely notice to the supervising nurse, the Nurse Defendants "provided training to staff with a written protocol of their responsibility for timely notification and documentation of all med events." *Id.* Once again, these exhibits do not support Plaintiffs' contention that the Nurse Defendants did not re-educate/re-train direct care staff when medication issues occurred. As to nearly every alleged medication incident in which Plaintiffs deny an adequate response by the Nurse Defendants, Plaintiffs rely on these same documents which, if anything, support the Nurse Defendants' position that actions were always taken to prevent these incidents from happening in the future.

Moreover, Plaintiffs complained to the Commission that on April 27, 2009, Dr. Bock issued a prescription for CoQ10, which was not started as prescribed. *See* Dkt. No. 385-4 at 102. As noted by both Defendant Gleason and the Commission, this prescription was not immediately administered to Michael at the request of Bradford Surlock! *See id.* at 99, 102. It is conceded that the direct care staff should have informed the supervising nurse, who then should have contacted the prescribing physician. *See id.* Again, in response to this, the Nurse Defendants provided training to staff with written protocols of the actions expected of them, should this issue arise in the future. *See id.* at 99. Interestingly, Plaintiffs now claim that, despite the fact that the supplement was not immediately given to Michael as prescribed at Mr. Surlock's request, the Nurse Defendants' failure to immediately administer the supplement somehow violated Michael's substantive due process rights.

Further, the evidence demonstrates that additional safeguards were put in place to address the issues of medication errors. According to a letter dated August 2, 2010 from the Commission

on Quality of Care and Advocacy, the Commission was satisfied with the newly implemented procedures put in place to address the issues related to medication errors. *See* Dkt. No. 385-4 at 97. Specifically, the Commission approved of the decision to inform the prescribing physician any time a medication error occurred to seek guidance on how to proceed. *See id.*

In an entirely conclusory manner, Plaintiffs also argue that Michael was harmed by these medication errors. *See* Dkt. No. 371 at 41. They contend that "the Nurse Defendants' expert's opinion as to the clinical effect of these medication errors is based entirely on theory; she did not personally observe or examine Michael after these errors." *Id.* (citing Dkt. No. 252-5). Mr. and Mrs. Surlock contend that they "witnessed first-hand the physiological effects of these medications errors on their son, see (Ex. G-72 and J), and so a reasonable jury could find that these errors, in fact, caused Michael physical harm." *Id.* Further, Plaintiffs argue that, "even if Michael experienced no physiological effect from these specific medication errors, a reasonable jury could find that their recurring nature and the substantial risk of harm in which they put Michael created an unsafe environment for him and that having to live in such an environment constitutes the constitutional harm." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 834 (1994)).

First, the exhibits to which Plaintiffs cite do not appear to exist. Second, even assuming that the Surlocks are qualified to testify how the occasional missed or incorrect dose of a medication impacted their son, their conclusory assertions that Michael experienced adverse effects from these medication errors are insufficient. Notably, although they indicate that Michael had "physiological effects" from the medication errors, they fail to provide the Court with a single example of such a physiological effect. Finally, contrary to Plaintiffs' contentions, the Nurse Defendants' expert provides a comprehensive analysis of the clinical effects of the alleged medication errors. For example, Dr. Carmen Nichita discussed the four missed doses of

Depakote, which is used to control seizures. *See* Dkt. No. 252-5 at 2. The alleged missed doses occurred over a four year period. *See id.* Around the dates when the alleged missed doses occurred, Dr. Nichita asserts that Michael's Depakote blood level ranged from 85-199, "which is an appropriate, therapeutic level for epilepsy." *Id.* Further, Dr. Nichita claims that "[i]t usually takes five days for this medication to obtain a stable level in the blood. One missed dose on occasion would not cause a major fluctuation in the blood level." *Id.* As to the three missed doses of Lamictal (Lamotrigine), which is also used to control seizures, Dr. Nichita contends that the "pharmacokinetics apply to lamotrigine as Depakote: One single, missed dose would not affect the blood level overall." *Id.* at 2-3. Further, since it takes longer for Lamictal to be eliminated from the blood in individuals who also take Depakote, a single missed dose would not significantly impact blood levels. *See id.* at 3. Although Dr. Nichita acknowledges that Michael still had occasional "breakthrough seizures" while on this medication, "he did not have seizure activity around the time of the missed doses of Lamictal or Depakote." *Id.*

Throughout her report, Dr. Nichita provides a similar analysis for each alleged medication error. *See id.* at 3-9. According to Dr. Nichita's report, notably absent from the record, with one minor exception, are any adverse events or effects from the alleged medication errors. *See id.* The only exception to this is that on September 29, 2009, Michael was administered three tablets of Diflucan 200mg tablets instead of Depakote. *See id.* at 6. Michael's primary care physician was called and, according to the physician's records, Michael had a "slight upset stomach, but no other adverse effects." *Id.* Plaintiffs' conclusory allegations regarding the "physiological effects" that these medication errors had on Michael are simply insufficient to withstand the Nurse Defendants' motion for summary judgment.

Finally, the Court notes that Michael was taking an extraordinary number of prescription medications and supplements during his time at Fravor Road. For example, the following represents the medications and supplements Michael was prescribed as of February 3, 2009: (1) Bentyl, (2) Protonix, (3) Trazodone 100mg, (4) Trazodone 50mg, (5) Geodon, (6) Dulcolox, (7) Benefiber, (8) Depokote, (9) melatonin, (10) "General Digestion," (11) Glutamine plus, (12) Calcium with Vitamin D, (13) Opti Zinc, (14) Probiotic Complete, (15) Cod Liver Oil, (16) Omega 3 Comp., (17) nutri Vitamin E, (18) Citramin, (19) Buffered vit. C, (20) magnesium Taura, (21) B-6, (22) P5P, (23) Co Enzyme B complex, and (24) B-12 injections given twice per week. *See* Dkt. No. 387-1 at 301. Most of these prescriptions and supplements were given multiple times per day, sometimes in a different dose than that which was given earlier in the day. *See id.* Further, the prescriptions were constantly changing. *See, e.g., id.* at 304. Given the sheer volume of medication and supplements that Michael was prescribed on a daily basis, the identified medication errors, over the course of four years, many of which were simply failures to document that a particular medication was given, are simply insufficient to support Plaintiffs' substantive due process claim against the Nurse Defendants.

This result is further supported by the fact that a number of the alleged medication errors occurred immediately following a change to Michael's prescriptions. For example, on May 14, 2009, Defendant Motyka reported that Michael's prescription for Geodon was changed from 40mg three times per day, to 60mg two times per day. *See* Dkt. No. 387-1 at 310. Cheryl Van Epps was not informed of the change, and Michael received three doses of Geodon on May 13 (two 40mg pill and one 60mg pill, resulting in a total of 140mg). *See id.* Upon discovering the error on May 14, the evening dose was withheld so that Michael only received 100mg that day, instead of 120mg, and Michael's doctor was informed of the issue. *See id.*; *see also* Dkt. No. 388-

1 at 219 (explaining the error and indicating that "after consultation he was under dosed on Thursday to compensate"). Further, in light of this event, it was decided that the "informal way med changes are communicated with Day program is being modified to a written notification." *Id.*

Quite simply, the evidence Plaintiffs have set forth is insufficient to support a substantive due process claim regardless of whether Plaintiffs' claim against the Nurse Defendant is analyzed under the deliberate indifference standard, the professional judgment standard, or the general shocks the conscience standard. As such, the Court grants the Nurse Defendants' motion for summary judgment as to Plaintiffs' substantive due process claim.

### 9. The Supervisory Defendants

Plaintiffs contend that Defendants Elliott, Alexander, Reid, LeBoeuf, and Perkins (the "Supervisory Defendants") violated their duty to provide Michael with a reasonably safe environment, to protect him from harm, and to provide him with adequate care and minimal habilitation. *See* Dkt. No. 371 at 42-50. As a result of these failures, Plaintiffs argue that "Michael was repeatedly injured, both physically and psychologically, was deprived adequate medical care and suffered regression in basic life skills." *Id.* at 42. "Specifically, on their supervisory watch, over the years, Michael was subjected to over fifteen reported incidents of physical and psychological abuse and neglect, over twenty serious injuries requiring ER visits, hundreds of other injuries, dozens of medication administration errors, worsening of his wrist contracture condition and regression in his toileting skills." *Id.* at 42-43.

According to Plaintiffs, the record demonstrates that Defendants "Reid and Perkins failed adequately to implement Michael's behavior plan to keep him safe from SIBs" in that they "took

the position that Michael's behavior plan made no provision for intervening once Michael had begun floor sprawling, except to try to get his helmet and mitts on and wait for his behavior to subside." *Id.* at 43 (citing Defendant Motyka Tr. at pp. 154-155 Ex. M-21).[21] Plaintiffs contend that this position "directly contravenes the plain language of the August 27, 2009, March 27, 2010 and August 27, 2010 behavior plans, which were in effect during both Reid's and Perkins' tenures." *Id.* Without citation to the record or even alluding to a specific incident, Plaintiffs argue as follows:

> Yet, despite the clear directives of Michael's behavior and their knowledge that the safe chair was an eminently safer place for Michael than being sprawled on the floor flailing about, both Reid and Perkins, and their subordinate staff at their direction, failed to move Michael to an available safer environment and thereby protect him from harm. As a result, Michael suffered form numerous physical injuries, which could have been avoided if Reid and Perkins properly implanted [sic] his behavior plan.

Dkt. No. 371 at 44.

First, Plaintiffs' citation to Defendant Motyka's deposition does not support their allegations. Defendant Motyka was asked about what staff were permitted to do when Michael was having an episode of SIB and Bradford Surlock was there trying to control Michael by holding him down on the floor. *See* Dkt. No. 375-20 at 1-2. When asked if staff would assist Mr. Surlock in restraining Michael, Defendant Motyka responded that they did not because, unlike

---

[21] In their response to the pending motions for summary judgment, Plaintiffs decided to file each individual Defendant's deposition transcript as multiple exhibits, which usually included no more than two pages. For example, in response to Defendant Finster's motion, Plaintiffs attached portions of Defendant Finster's deposition transcript as the following exhibits: F-104, F-105, F-110, F-111, F-112, F-113, F-114, F-115, F-116, F-118, F-119, F-120, F-124, F-125, F-126, F-127, F-129, F-130, F-131, F-132, F-133, and F-134. This practice created hundreds of needless exhibits, since it was used for all depositions taken in this matter. In the future, counsel is instructed to file an individual's deposition transcript as a single exhibit, including only those pages deemed relevant.

Mr. Surlock, staff was "not allowed to hold him down on the floor." *Id.* Staff would, however, place mitts on Michael's hands and a helmet on his head when he was engaging in such behavior, as per his treatment plan. *See id.* Not once were Defendants Reid or Perkins mentioned in the cited portion of Defendant Motyka's deposition. Further, the testimony demonstrates that staff were actually following Michael's behavior plan, which called for the use of "the least intrusive physical intervention necessary." Dkt. No. 397-1 at 104-08. Staff were directed to place the protective mitts and helmet on Michael at the first sign of SIB and then redirect Michael's attention if possible. *See id.* If staff were unable to redirect Michael, they were then instructed to escort Michael to his safe chair. *See id.* Further, the plan specifically provided as follows: "Restrictive Physical Intervention (that is, the use of a take-down to a supine control) can not be safely used with Michael due to his significant osteoporosis and the increased associated risk of fractures." *Id.* at 99. Finally, the record clearly demonstrates that the behavior plan was actually working in that the frequency of his SIBs had decreased significantly from when Michael first came to Fravor Road. *See id.* at 97-98. This was attributed, in part, to the fact that the behavior plan called for staff to use the least amount of physical contact necessary to keep Michael safe because physical contact appeared to encourage the proliferation/exacerbation of Michael's SIBs. *See id.*

Next, Plaintiffs argue that "the record demonstrates that LeBoeuf knew of, but disregarded, the high degree of risk that her subordinates would violate Michael's constitutional rights, and her deliberate indifference caused such violations." Dkt. No. 371 at 44-45. "Specifically, when OPWDD interviewed her during its investigation of defendant Graham's abusive behavior of Michael, which consisted of Graham sitting on Michael's lap, poking him in the nose and declaring, 'I fucking hate you; you are so bad,' LeBoeuf admitted that she had seen

74

other staff do 'similar things,' such as sit on one arm of Michael's recliner, with their legs across his lap and not reported the behavior or taken any meaningful remedial step." *Id.* at 45 (citing Defendant Graham Dep. Doc. Exhibit 17 at M-24).

Again, Plaintiffs entirely misconstrue the cited document. The incident report issued after the investigation into Defendant Graham's alleged conduct made the following findings:

> I spoke with Ms. LeBoeuf in my office on the morning of 7/14/08 to review this situation. She mentioned that she has never seen a staff sit in Michael's lap, but that she has seen other staff do "similar" things such as sit next to him with an arm around his shoulder or maybe standing next to Michael with one of the staff's legs against Michael's thigh. She also said that possibly a staff could sit on one arm of Michael's recliner with one or both legs crossing Michael's lap, but actually on the other arm of the recliner so that it would appear they were sitting on his lap. Ms. LeBoeuf also mentioned the fact that Michael appeared to get some degree of satisfaction from having physical contact with some of the female staff.

Dkt. No. 375-23 at 1. Nothing in this report indicates that Defendant LeBoeuf was aware of allegedly abusive conduct that would have put her on notice that Michael's rights were potentially being violated. Rather, the report indicates that the other "similar situations" were, in fact, staff engaging with Michael in a positive manner which appeared to bring him "some degree of satisfaction." *Id.* Far from supporting their argument, the evidence to which Plaintiffs cite actually undermines it.

Next, Plaintiffs contend that "the record demonstrates that Elliott and Alexander, each of whom had influence over staffing levels at Fravor Road, failed to advocate for and provide the one-to-one supervision Michael required to stay safe." Dkt. No. 371 at 45 (citing Ex. 8). Plaintiffs argue that Defendants Elliott and Alexander "were repeatedly put on notice by Bradford and Mary-Anne, Michael's Medicaid Service Coordinators, CQC and even house staff that

Michael was receiving insufficient supervision at Fravor to stay safe. . . . Indeed, both testified that it was unreasonable to leave Michael alone for any significant period of time, . . . [and] at one point, even Alexander expressed to her supervisors and members of Michael's team that Michael could benefit from one-to-one supervision." *Id.* at 45-46 (citing Ex. 8 p. 22).

As a preliminary matter, the Court notes the fact that Plaintiffs begin by arguing that Defendants Elliott and Alexander "failed to advocate for and provide the one-to-one supervision Michael required to stay safe." Dkt. No. 371 at 45. Then, two sentences later, Plaintiffs admit that Defendant Alexander did, in fact, discuss with her supervisors the fact that Michael could benefit from one-to-one supervision. As Plaintiffs concede, in an email dated December 22, 2009, Defendant Alexander suggested increasing staff levels to provide Michael with one-to-one supervision or, alternatively, changing staff arrangements to provide Michael with greater supervision. *See* Dkt. No. 374-1 at 22.

As discussed above, contrary to Plaintiffs' position, the undisputed facts clearly demonstrate that, in light of requests for one-to-one staffing or greater supervision, changes were made. *See, e.g.*, *id.* at 19, 24. Further, the record also demonstrates that the frequency of Michael's SIBs and injuries decreased over time, in part due to the additional staff oversight and reduction in patients residing at Fravor Road. Moreover, the record is replete with evidence that the Supervisory Defendants constantly addressed Michael's supervision level and ways in which to prevent him from injuring himself. For example, on January 5, 2010, the Treatment Team held a meeting in response to the Surlocks' requests to discuss the feasibility and desirability of providing one-to-one supervision for Michael. *See* Dkt. No. 410-2 at ¶ 54; Dkt. No. 410-18 at 2-5. In response to the request, the Treatment Team "agreed to provide enhanced staffing to Michael on Saturdays and holidays when Michael is home from Program." Dkt. No. 410-18 at 2.

Further, it was decided that staff would be assigned to Michael in two-hour shift increments, that they would need to remain within visual sight of him, and that they would need to "be available to respond to him immediately at all times." *Id.* (emphasis in original). The evidence makes clear that, at every stage, the Supervisory Defendants evaluated all requests for one-to-one supervision both in person and through written communication. *See, e.g.*, Dkt. Nos. 410-18, 410-21, 410-45 & 410-46.

Plaintiffs also heavily rely on a series of investigations by the New York State Commission on Quality of Care & Advocacy for Persons with Disabilities (the "CQC") in support of their argument that the Supervisory Defendants failed to remedy inadequate staffing at Fravor Road. Plaintiffs fail to mention, however, that the OPWDD, with the cooperation of the Supervisory Defendants, investigated the concerns raised and provided thorough and thoughtful responses to the CQC detailing their efforts to address concerns. *See* Dkt. Nos. 410-7, 410-10, 410-12 & 410-15. The CQC approved of the OPWDD's responses and the investigations were closed. *See, e.g.*, Dkt. No. 410-8 at 2 ("The Commission has completed its review of the DDSO's March 20, 2009 response to our February 20, 2009 letter of findings regarding our review of the care and treatment being provided to Fravor Road IRA resident Michael Surlock. The findings and corrective actions detailed in Mr. DiNuzzo's letter adequately addressed all of the Commission's noted concerns and you may now consider our involvement in this matter to be concluded"); *see also* Dkt. Nos. 410-13 & 410-16.

Further, the fact that Michael did not eventually receive one-to-one supervision does not mean that the Supervisory Defendants "failed to remedy a wrong." The undisputed facts clearly demonstrate that the decision to implement Enhanced Staffing was clinically driven and influenced by the fact that actual one-to-one supervision would not be appropriate for Michael,

who enjoyed having some privacy. *See* Dkt. No. 410-46 at 2-3. It is undisputed that Michael sustained injuries while at Fravor Road. However, as Plaintiffs concede, it is impossible to prevent all injury to Michael when he engages in SIBs and floor sprawling. *See id.* at 3.

Plaintiffs also claim that "the record demonstrates that the Supervisory Defendants failed to take adequate measures to ensure Michael had access to, and was not deprived of, his critical sensory devises. For instance, as early as June 26, 2008, Bradford notified Elliott that Fravor Road staff [were] unplugging Michael's electronic and sensory devices, an integral part of his treatment and care." Dkt. No. 371 at 46-47 (citing Ex. M-46). Plaintiffs contend that the other Supervisory Defendants were put on similar notice. *See id.* at 47 (citing Ex. M-47). As a result of their failure, Plaintiffs claim that Michael was harmed "by depriving him of these critical sensory devices which helped calm him and prevent SIBs." *Id.* (citing Ex. 11).

Contrary to Plaintiffs' allegations, the undisputed facts demonstrate that, in response to the Surlocks' repeated complaints, the Supervisory Defendants directed Michael's direct care providers not to unplug any of the devices in Michael's room. Further, the Supervisory Defendants investigated Plaintiffs' allegations and, even though the complaints were generally not substantiated, the Supervisory Defendants took corrective actions to ensure that the activities Plaintiffs complained of would not occur in the future. *See, e.g.*, Dkt. No. 410-2 at ¶¶ 110-11; Dkt. No. 410-1 at ¶¶ 113-15; Dkt. No. 410-52 at 214, 216-17; Dkt. No. 410-53 at 225-26.

Plaintiffs also argue that the Supervisory Defendants "failed to ensure that Michaels' [sic] corrective wrist splint was being properly applied. Indeed, Bradford and Mary-Anne repeatedly complained about this issue, which was also the subject of a CQC investigation, which substantiated plaintiffs' claim that Michael's night-time splint was not being applied consistently with doctor's orders." Dkt. No. 371 at 47 (citing Exs. 12-14, and M-46). Plaintiffs contend that

this "caused a worsening of Michael's wrist contracture, requiring him to undergo surgery for the condition." *Id.* (citing Ex. M-51).

Although Plaintiffs are correct that the CQC substantiated the allegation that Michael's wrist splint was not being properly applied, they omit the fact that the CQC later approved of the OPWDD's corrective response (retraining was provided to ensure the splint was properly applied, and a splint accountability procedure was put in place) and closed the investigation. *See* Dkt. No. 250-29; Dkt. No. 410-15; Dkt. No. 410-16; Dkt. No. 410-2 at ¶¶ 100-02; Dkt. No. 410-1 at ¶¶ 100-08; Dkt. No. 410-4 at ¶¶ 34-36. Moreover, with their motion for summary judgment, the Supervisory Defendants presented an affidavit and report from Dr. Daniel G. DiChristina, who is an orthopedic surgeon licensed to practice in New York. *See* Dkt. No. 252-6. According to Dr. DiChristina, Michael suffered from flexion contracture in his left wrist. *See id.* at ¶ 10. Dr. DiChristina indicated that the "value of the splint is to provide a temporary correction of the wrist. Splinting will not change the underlying spasticity." *Id.* at ¶ 18. Further, Dr. DiChristina stated that, "regardless of the duration of splinting, [Michael's] current level of wrist flexion contracture could not be avoided." *Id.* at ¶ 20. In opposition, Plaintiffs rely on their expert, Mark Levine, who purports to be an expert in "the field of health care/housing administration" and does not claim to have any medical training. *See* Dkt. No. 371-7 at 1. In fact, Mr. Levine acknowledges that he "will not opine on medical causation." *Id.* As such, the Court finds that Plaintiffs' conclusory assertions that Michael's wrist condition was worsened due to the failure to consistently apply his wrist splint is insufficient to create a question of fact as to this claim. Even assuming that such a question of fact exists, as discussed above, the evidence also demonstrates that when these issues were brought to the Supervisory Defendants' attention, they took

reasonable measures to ensure that the problem was remedied. Accordingly, the Supervisory Defendants are entitled to summary judgment as to these allegations.

Plaintiffs also contend that, "on the Supervisory Defendants' watch, Michael's toileting skills substantially regressed. Indeed, as early as September 22, 2009, Medicaid Service Coordinator Price wrote Elliott and advised that, prior to entering Fravor and when he was living at home, Michael was successfully toilet-trained but that, since his entry into Fravor, there has been confusion by house staff as to his toilet training." Dkt. No. 371 at 47. Moreover, Plaintiffs claim that similar complaints were made to Defendant LeBoeuf, but she and "her staff constantly ignored Michael's toileting plan, routinely leaving Michael in diapers, and Elliott and Alexander failed to ensure that Michael's team and the Fravor Road staff minimally train Michael in this basic life skill." *Id.* at 47-48 (citing Exs. M-48-52).

Contrary to Plaintiffs' contentions, the Supervisory Defendants actively addressed these concerns through the Treatment Team. In response to these concerns, the Treatment Team, which included Michael's parents, developed a comprehensive plan to address these issues and train staff as to its implementation. *See, e.g.*, Dkt. No. 410-41; Dkt. No. 410-42. In an October 6, 2009 email from Defendant Elliott, she indicates that the "toileting plan was developed by Jim Spillett after lengthy input from both parents, OT, and Psychologist. Mrs. Surlock did not agree to the plan because it did not include taking Michael back to the bathroom every 15 minutes until he voided. The plan does state 'staff may ask him if he has to go any time up to the next scheduled toileting: time permitting.'" Dkt. No. 410-41. Moreover, staff were required to keep comprehensive records concerning Michael's toileting schedule and results. *See* Dkt. No. 410-42. It is undisputed that, despite these efforts, which included being prompted to use the toilet every forty-five minutes and return visits in between, Michael continued to have accidents. As the

Supervisory Defendants correctly contend, the Treatment Team's inability to cure Michael's toileting issues does not amount to a substantive due process violation. Rather, the evidence demonstrates that they continually changed Michael's treatment plan and ensured that direct care staff were trained as to any changes.

Plaintiffs also claim that the Supervisory Defendants failed to provide Michael with safe transportation. First, the Supervisory Defendants were merely responsible for implementing Michael's transportation plan, which was developed by his Treatment Team with his parents' input. *See* Dkt. No. 410-33; Dkt. No. 410-34; Dkt. No. 410-36; Dkt. No. 410-38. Second, when it was decided that the rear seat in Fravor Road's current van was not providing Michael with sufficient support, they first attempted to replace the current seat. *See* Dkt. No. 410-33. When that solution proved to be insufficient, Fravor Road actually purchased a new van that could better deal with the safety concerns. Moreover, the record also indicates that, despite the fact that the Transportation Plan was working, several modifications were made pursuant to the Surlocks' requests. *See, e.g.*, Dkt. No. 410-36 at 2-3; Dkt. No. 410-38 at 2-4. Some of these requests included transporting Michael without mitts on his hands. *See* Dkt. No. 410-36 at 2-3; Dkt. No. 410-38 at 2-4. Although the staff had concerns about transporting Michael in this manner because it could put him at risk of harming himself or others, they acceded to the Surlocks' demands and transported Michael in this manner for a trial period. *See id.* The Treatment Team decided that mitts during transportation were in Michael's best interest, in part, based on the trial run. During that two week period, "[t]here were 6 times out of a possible 20 when Michael became self injurious or agitated to the point where the van pulled off the road, and his mitts were applied." Dkt. No. 410-38 at 3. Again, far from showing a deliberate indifference to Michael's safety and well-being, the Supervisory Defendants and direct care staff spent considerable time

and resources ensuring Michael's safety. In fact, the only changes to Michael's Transportation Plan that raised safety concerns were demanded by the Surlocks, despite the concerns raised by those tasked with providing his care.

Finally, also in support of their claim, Plaintiffs contend that "Defendant Reid admitted, 'I wouldn't want [FR] staff working for me or my child.'" Dkt. No. 410-57 at ¶ 202 (quoting Defendant Reid Dep. Tr. at p. 276 (Ex. S-215)) (alteration in original). Again, this statement is taken entirely out of context and is, at best, a disingenuous representation of what Defendant Reid stated. The complete interaction is set forth below:

> Q. Do you agree that the staff person who slaps a resident at the Fravor Road facility should not be working with individuals with disabilities?
>
> A. That's not my – I wouldn't want the staff working for me or my child.

Dkt. No. 410-53 at 276. As the complete interaction makes clear, Defendant Reid did not state that he would not want Fravor Road staff in general working for him or with his child. Rather, he would not want someone working for him or with his child who had, in the past, slapped residents at the home. Indeed, Defendant Reid generally spoke very highly of the dedicated and caring staff employed at Fravor Road.

In sum, the undisputed facts establish that the Supervisory Defendants went above and beyond to accommodate the Surlocks' constant demands and did all that they could to provide Michael with the best care possible. Under any of the above-mentioned standards, the Supervisory Defendants have demonstrated that they are entitled to summary judgment as to Plaintiffs' substantive due process claims.

## G.     Procedural due process

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from '"an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" *Pichen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quotation and other citation omitted). The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) (citation omitted).

"'Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has long ranked as of basic importance in our society, . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard or disrespect.'" *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996)). The Supreme Court has recognized that parents have a "constitutionally protected liberty interest in the care, custody, and management of their children," *id.* (collecting cases), and the Second Circuit has noted that "'[c]hildren have a parallel constitutionally protected liberty interest in not being

dislocated from the emotional attachments that derive from the intimacy of daily family association.'" *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2011) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000)).

As a general rule, procedural due process requires a hearing prior to depriving a parent of the care, custody or management of their children without their consent, *id.* at 149 (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003)), or a prompt post-deprivation hearing if the child is removed under emergency circumstances, *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 215 (S.D.N.Y. 2013) (citing *Velez v. Reynolds*, 325 F. Supp. 2d 293, 303 (S.D.N.Y. 2004)), or where the deprivation occurs at a time when the child is already in the custody of the State. *Kia P.*, 235 F.3d at 760 (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 520 (2d Cir. 1996)).

"To determine whether there have been sufficient procedural protections before an individual is deprived of a liberty interest, courts rely on the test stated in *Mathews v. Eldridge*, assessing: 1) 'the private interest that will be affected by the official action;' 2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and 3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Graham v. City of New York*, 869 F. Supp. 2d 337, 350 (E.D.N.Y. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893 (1976)). "'As a general rule . . . before parents may be deprived of the care, custody or management of their children without their consent, due process – ordinarily a court proceeding resulting in an order [approving,] permitting[,] [or ordering] removal – must be accorded to them.'" *Graham*, 869 F. Supp. 2d at 350 (quoting *Tenenbaum*, 193 F.3d at 593) (other citation omitted). "Similar process

is due when the government action substantially restricts a non-custodial parent's relationship with the child." *Id.*

In the present matter, Plaintiff Bradford Surlock "asserts his procedural due process claim against defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander for their decision to restrict his ability to visit Michael at Fravor, including banning him from entering the house for a three-month timeframe." Dkt. No. 371 at 63. Defendants contend that Plaintiffs have failed to cite to any "policy, rule, regulation or legal authority in support of their claim that Mr. Surlock had a federally protected liberty interest of unrestricted access to the Fravor Road IRA after he flagrantly and repeatedly engaged in abusive and sexually harassing conduct toward staff at the Fravor Road IRA including interfering with and making demands of staff while they were attending to Michael, the use of profanity, wearing clothing with inappropriate sexual messages, making references to staff's body parts and to nude photographs and even making inappropriate sexual comments to female staff as he observed his son engaging in private sexual conduct at the home." Dkt. No. 249-46 at 29-30 (emphasis omitted).

As a threshold matter, the Court must determine whether banning Plaintiff Bradford Surlock from Fravor Road for three months infringed on his right to the "care, custody and management" of Michael or his right to remain together as a family, such that he can argue that process was due to him either before or after the order banning him from the facility. *See K.D. v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 214 (S.D.N.Y. 2013) (citing *Rodriguez v. McLoughlin*, 214 F.3d 328, 341 (2d Cir. 2000)). Defendants correctly contend that the present litigation is not the typical case in which a child has been removed from a parent's custody by the state without hearing. Nor does it fall into the more rare case occurring when a parent voluntarily leaves a child with a third party, and the third part later refuses to return the child to the parent on

the basis of state authority. *See, e.g.*, *Cecere v. City of New York*, 967 F.2d 826, 830 (2d Cir. 1990). As such, the Court must determine whether Plaintiff Bradford Surlock has a liberty interest in unrestricted access to the state-owned facility where his son was residing.

"In light of the Second Circuit case law holding that the liberty interest in the care, custody and management of a minor child is implicated by removal of the child from the custody of the parents, district courts in this Circuit have repeatedly dismissed procedural due process claims where there is no allegation that the parents were ever deprived of custody over their children." *K.D.*, 921 F. Supp. 2d at 215 (citation omitted); *see also Phillips v. County of Orange*, 894 F. Supp. 2d 345, 373-76 (S.D.N.Y. 2012) (collecting cases). "'[O]utside of removal or the compulsory provision of medical care, the Second Circuit has not specified what other kinds of government action may violate a parent's protected liberty interest in the care, custody and management of his or her child in the child abuse context.'" *Id.* (citing *Phillips*, 894 F. Supp. 2d at 374, 376-77).

Some lower courts have recognized that government actions other than physical removal might also implicate the liberty interests of parents. *See, e.g., Graham v. City of New York*, 869 F. Supp. 2d 337, 349 (E.D.N.Y. 2012) (noting that "[g]overnment actions other than removal may also implicate important rights," and concluding that temporary orders of protection that forbade a father from having any contact with his son for more than a year and significantly limited their contact for several years implicated the father's "vital rights as a parent"). Despite these cases, the Court finds that Bradford Surlock did not have a protected liberty interest in unlimited access to the Fravor Road facility in which Michael resided.

Plaintiffs cite to no authority, either within or without the Second Circuit, to support their position that Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander violated Plaintiff

Bradford Surlock's procedural due process rights when they precluded him from entering the Fravor Road facility for a three-month period and the Court was unable to find any such authority.

The letter precluding Mr. Surlock from entering Fravor Road indicated that the restriction was being implemented because of inappropriate and insulting comments made to an employee in the presence of the house manager and within earshot of another employee. *See* Dkt. No. 378-8 at 1. The letter states that Mr. Surlock allegedly made reference to "nude photos" and a comment to a staff member that she should "walk more" and that the tone and content of the comments "violated parameters that had been put in place for you in April of this year, as they violate the requirement that you refrain from comments, gestures, or innuendo of a sexual or suggestive nature when you are visiting at the IRA." *Id.* The letter further indicated as follows:

> This restriction will remain in place for a period of 3 months, at which time the Deputy Directors will meet with you to discuss and review the parameters to ensure that you are prepared to comply prior to re-entering this worksite. We feel this measure is necessary to reinforce the seriousness of these violations, and to stabilize the Fravor IRA worksite.
>
> We understand that this worksite is also the home of your son, Michael. Please be advised that while your visits to the IRA are restricted, there is no such restriction or limitations on your wife's visitation. Furthermore, there is no restriction on your visitation with Michael at your home or other locations outside of this IRA. The agency continues to support your relationship with your son and your involvement in his plan of care. We understand that you may necessarily need to interface with staff during Dr's appointments and treatment team meetings outside of the IRA, and we request that these interactions are limited to discussion of Michael's care. We understand that you may need to assist your wife in transporting Michael for home visits; however, we request that you remain in your vehicle in the driveway during these times. If your wife requires assistance of the IRA staff to transport Michael for home visits, she may discuss this with the house manager to make arrangements.

*Id.* at 1-2.

As the letter makes clear, Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander did not block all access to Michael. Rather, Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander simply precluded Plaintiff Bradford Surlock from entering the Fravor Road facility to see his son for a three-month period. These Defendants did not interfere with Mr. Surlock's rights to the "care, custody and management" of Michael; rather, they prevented him from exercising those rights in the exact manner and place of his choosing. Significantly, Plaintiffs Bradford and Mary-Anne Surlock were able visit with Michael at their home or any location other than the Fravor Road facility. Unlike the situation where a child is placed in state custody following an allegation of abuse, Michael was voluntarily placed in Defendants' custody. Although Bradford and Mary-Anne Surlock unquestionably continue to possess protected liberty interests with respect to the care, custody, and management of Michael, Defendants' alleged conduct simply did not infringe on those rights.

As such, Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander are entitled to summary judgment on this claim.

## H. First Amendment retaliation

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the

defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams*, 535 F.3d at 76 (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

In cases "involving criticism of public officials by private citizens," the Second Circuit has generally "impose[d] an actual chill requirement for First Amendment retaliation claims[,]" *i.e.*, a requirement that the plaintiff allege and ultimately prove an "actual chill" of his First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)); *see also Curley*, 268 F.3d at 73 (holding that the "plaintiff must show, with respect to the third element, that his First Amendment rights were 'actually chilled'"). To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See, e.g., Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (holding that, to establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring the exercise of First Amendment freedoms"); *Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, *6 (S.D.N.Y. Apr. 27, 2009) (holding that, "[i]n order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (holding that "Spear's naked assertion of a chill does not suffice to defeat a Rule 12(b)(6) motion"); *see also Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)

(affirming summary judgment for the defendant on the plaintiff's First Amendment claim and indicating that the plaintiff had failed to even state a valid claim because she had "alleged no actual affect on the exercise of her First Amendment rights at all").

However, "where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim." *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 (E.D.N.Y. 2009) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)) (other citation omitted). As the Second Circuit has noted,

> defendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech. In the employment context, under this framework, the harm is some concrete diminution in job responsibilities, security, or pay – up to and including termination. In the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks. Indeed, even in certain cases involving public official/private citizen retaliation claims, we have seemingly not imposed a subjective chill requirement where some other harm is asserted. For example, in *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994), we confronted the plaintiffs' claim that the municipal defendants' alleged misapplication of the zoning code was conducted in retaliation for the plaintiffs' exercise of their free speech rights. To establish a retaliation claim under 42 U.S.C. § 1983 under those circumstances, we held that the plaintiffs must initially show (1) "that [their] conduct was protected by the first amendment," and (2) that "defendants' conduct was motivated by or substantially caused by [plaintiffs'] exercise of free speech." *Id.* at 194 (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)), and nothing beyond the two requirements. Still, the *Gagliardi* plaintiffs' retaliation claim apparently survived a motion to dismiss because (1) they made an adequate showing on both of these accounts, but also because (2) they adequately pleaded non-speech injuries – among other things, noise pollution. *Id.* at 190. *See also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) (applying same test in similar context).

*Gill*, 389 F.3d at 383.


### 1. Defendant Spencer

Plaintiffs Mary-Anne and Bradford contend that Defendant Spencer engaged in several retaliatory acts that were "motivated by the Surlock's protected activity of monitoring and advocating for Michael's care." Dkt. No. 371 at 62-63. Specifically, Plaintiffs contend that Defendant Spencer "admits that she unplugged Michael's radio, and the record demonstrates she did this on more than [one] occasion. By doing so, Spencer deprived Michael of a critical sensory device, thereby causing him psychological injury and putting him at risk of physical injury." *Id.* at 62. Further, Plaintiffs argue that "[i]n light of Finster's testimony that staff suspected that the Surlocks had installed a camera in Michael's room and were unplugging his electronic devices to avoid being recorded, a reasonable jury could reject Spencer's contention that she unplugged the radio for a legitimate reason and, instead, find that her action was motivated by the Surlock's protected activity of monitoring and advocating for Michael's care." *Id.* at 62-63. Moreover, Plaintiffs contend that this claim is "also supported by Maynes' disclosures to the Surlocks that direct care staff intentionally retaliated against them in various ways, including by depriving Michael of his sensory devices, and that the Supervisory Defendants and direct care staff disliked them and purposefully gave them and Michael the 'silent treatment.'" *Id.* at 63.

First, to the extent that Plaintiffs Mary-Anne and Bradford contend that they received the silent treatment from staff or that staff members were rude to them, these conclusory allegations are insufficient to support a First Amendment retaliation claim. *See Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 287 (E.D.N.Y. 2012) (holding that the plaintiff's evidence of receiving

the "silent treatment" was insufficient to support causation for his First Amendment retaliation claim).

Plaintiffs contend that "monitoring" Michael's care is an activity protected by the First Amendment.  Notably, they have failed to provide any cases to support this proposition. Generally, courts have recognized a First Amendment right to monitor and record the actions and words of public officials on public property.  *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (citations omitted).  This right to record matters of public interest, however, generally involves public meetings, police interactions with the public, and the general actions of officials in public locations.  *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (holding the "filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities," is protected by the First Amendment); *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (finding that the plaintiffs' interest in filming public meetings is protected by the First Amendment); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest"); *Iacobucci v. Boulter*, No. 94-cv-10531, 1997 WL 258494 (D. Mass. Mar. 26, 1997) (finding that an independent reporter has a protected right under the First Amendment and state law to videotape public meetings); *see also United States v. Hastings*, 695 F.2d 1278, 1281 (11th Cir. 1983) (finding that the press generally has no right to information superior to that of the general public) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("[I]t is not just news organizations . . . who have First Amendment rights to make and display videotapes of events. . . ."); *Thompson v. City of Clio*, 765 F. Supp. 1066, 1070-71 (M.D. Ala. 1991) (finding that the city council's ban on a member's attempt to record proceedings constituted regulated

conduct protected by the First Amendment). Notably, each of these scenarios involved public officials in public spaces. Nothing in these cases supports the proposition that the First Amendment[ protects a parent's right to place a hidden camera in the bedroom of their child who resides in a state run home for severely handicapped individuals.

Next, Plaintiffs do not claim that their speech was effectively chilled as a result of any alleged retaliation, nor could they. As such, Plaintiffs are required to put forth evidence that they "suffered some other concrete harm." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). In their memorandum of law, Plaintiffs argue that Defendant Spencer deprived Michael of his sensory devices on several occasions because of their advocacy on Michael's behalf. *See* Dkt. No. 371 at 62-63. This speculative and conclusory allegation, however, is not the type of non-speech related harm that has been found sufficient to support a First Amendment retaliation claim. *See Dorsett*, 732 F.3d at 161 (finding that delay in approving a settlement did not "constitute[ ] a concrete injury giving Plaintiffs standing"). As discussed, various non-speech related harms are sufficient to give a plaintiff standing to support a First Amendment retaliation claim. *See Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); *Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (additional scrutiny at border crossing); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (revoking a building permit); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (refusal to enforce zoning laws). Plaintiffs have failed to put forth any evidence establishing any such non-speech related harms as to Defendant Spencer and, therefore, Plaintiffs' First Amendment retaliation claim against Defendant Spencer must be dismissed.

Based on the foregoing, the Court grants Defendant Spencer's motion for summary judgment as to this claim.

## 2. The Administrative Defendants

According to Plaintiffs, the Administrative Defendants "do not dispute that they were personally involved in issuing parameters restricting Bradford's ability to visit with Michael at Fravor and advocate for Michael's care and in suspending his visitation rights or that these actions constitute actionable concrete harms. [The Administrative Defendants] argue only that there is no causal link between Bradford and Mary-Anne's protected activity and these actions, that they would have taken these actions irrespective of any protected activity and that, in any event, they are entitled to qualified immunity." Dkt. No. 371 at 59. Plaintiffs contend that summary judgment is inappropriate because these "defenses all implicate fact intensive analysis which is not appropriate on a motion for summary judgment." *Id.* Specifically, Plaintiffs claim that "a reasonable jury could find from the face of the April 6, 2010 letter sent by O'Brien and DiNuzzo to Bradford as well as from the restrictive 'parameters' attached thereto, that Brad's protected activity substantially motivated their decisions to restrict Brad's visitation and, ultimately, ban him from Fravor." *Id.* (citing Ex. M-65). Although Plaintiffs admit that the letter and its parameters address alleged "sexual innuendo and offensive comments," they contend that a reasonable jury could find that these claims are merely a pretext for the Administrative Defendants' First Amendment retaliation. *See id.* at 60. Plaintiffs note that Bradford denies having engaged in the alleged activity and finds significant that "neither Gleason, O'Brien nor DiNuzzo cared to hear his version of events before imposing these draconian restraints on his ability to visit his son and monitor the care provided to Michael." *Id.* Plaintiffs further contend that the same is true with regard to the September 2010 decision to ban Bradford from entering Fravor Road for three months. *See id.*

In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the plaintiff was arrested in the course of a robbery, pleaded guilty to criminal charges, and then brought an action against the arresting officers and their employer alleging that they had used excessive force in effecting his arrest. The plaintiff asserted that the officers had beaten him after he surrendered and then threw him from a third-story window. The officers denied this and all testified that the plaintiff had attempted to escape by jumping from the window. The defendants moved for summary judgment, which was granted by the district court, and the plaintiff appealed, arguing that a material question of fact existed in the conflicting versions of events presented by the plaintiff and the defendants. *See id.* at 551–53.

On appeal, the Second Circuit Court of Appeals noted that conflicting testimony concerning a material issue of fact generally presents issues of credibility which can only be resolved by a fact-finder at trial. *See Jeffreys*, 426 F.3d at 554. On a motion for summary judgment, however, the party opposing the motion is required to do more than offer opposing conclusory or speculative statements. *See id.* (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.1998)) (holding that a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful"). Upholding the district court's decision, the Second Circuit found that (1) nothing in the record supported the plaintiff's allegations "other than plaintiff's own contradictory and incomplete testimony," and (2) "no reasonable person could believe Jeffreys' testimony." *Id.* at 555 (internal quotation marks omitted).

For the *Jeffreys* exception to apply, the following conditions must be present: (1) the plaintiff must rely almost exclusively on his own testimony; (2) the plaintiff's testimony must be contradictory or incomplete; and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *See id.* The Second Circuit has made clear that the exception set forth

95

in *Jeffreys* is only appropriate in extraordinary circumstances, and "'if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555 n.2). "However, in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Id.* (quotation omitted). "To hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings (or, as here, to facts not alleged in their pleadings), would 'license the mendacious to seek windfalls in the litigation lottery.'" *Id.* (quoting *Arrington v. United States*, 473 F.3d 329, 444 (D.C. Cir. 2006)).

In the present matter, the Court finds that, although Plaintiff Bradford Surlock disputes the fact that he was ever abusive or inappropriate, or that he ever yelled at staff at Fravor Road, summary judgment is still appropriate as to the First Amendment retaliation claims against the Administrative Defendants. His allegations are supported almost exclusively by his own self-serving, incomplete testimony, that is contradicted by an overwhelming amount of evidence to the contrary, including observations by the named Defendants, non-party individuals, and even Mary-Anne Surlock.

In a letter dated April 6, 2010 from Defendants O'Brien and DiNuzzo to Plaintiff Bradford Surlock, parameters were established for Mr. Surlock's "adherence during visitation with Michael at the IRA, and in the state vehicle." Dkt. No. 376-20 at 1. Further, the parameters also contained guidelines for Mr. Surlock's interactions with clinical staff and administrative team members. *See id.* These parameters including the following:

> - Refrain from any actions or words that could be interpreted as threatening or aggressive.
>
> - No comments, gestures or innuendo of a sexual or suggestive nature to employees.
>
> - Refrain from demands for information from staff. (Other than critical information required to be exchanged before or after a home visit).
>
> - Refrain from criticism of staff; concerns should be channeled through the house manager.
>
> - Refrain from derogatory statements about clinical staff and administrative team members.
>
> -Refrain from intervening or directing staff when they are in process of implementing a care plan or behavioral plan. (IE; If staff are implementing the safe chair procedure, you should move away from the area).
>
> -During evening visits remain directly with Michael or wait for him in his bedroom. (IE; if Michael is occupied with bathing, please wait for him in his bedroom).
>
> - Any request for accompanying staff and Michael in the vehicle must be approved in advance by the site managers.

Dkt. No. 376-20 at 1. The letter concluded with the warning to Mr. Surlock that "[f]ailure to comply with these parameters may result in further limitations on your visitation at the IRA." *Id.* These parameters were revised in June of 2010 to include a restriction on sexually offensive clothing. *See* Dkt. No. 249-12 at 156. According to Defendant O'Brien, on June 5, 2010, Mr. Surlock came to Fravor Road wearing a t-shirt that contained "graphic material of a sexual nature. Specifically, the shirt logo stated 'Republic of Poontang,' and it contained a sexually graphic drawing of a woman." *Id.* Defendant O'Brien made this amendment after receiving an email from Defendant Reid reporting the incident, which indicated that he and three other employees found the shirt offensive and inappropriate. *See id.* at 158.

On September 9, 2010, Sandra Coant filed a workplace violence event report. *See* Dkt. No. 249-8 at 151-52. According to the report, while Ms. Coant was talking to Defendant Reid, Mr. Surlock entered the office and interjected himself into their conversation, eventually making reference to "nude photos" and that Ms. Coant "should walk some more." *Id.* After the report was made, Senior Personnel Administrator Doug Lee investigated the incident. *See id.* at 155. From this investigation, and in consultation with Counsel's Office, the Administrative Defendants determined that Mr. Surlock's conduct violated the parameters previous set forth governing his conduct while at Fravor Road or engaging with its staff. *See id.* at 171-73. As such, in a letter dated September 17, 2010, Defendant O'Brien informed Mr. Surlock that, in light of his continued violations of the parameters, he would not be permitted to enter Fravor Road for three months. *See id.*

Additionally, in a report dated March 2, 2009, Pamela Wellman, NPC, and Deb Rickard, NA, went to Fravor Road to observe medication procedures and report on any issues. *See* Dkt. No. 250-26 at 34-37. In this report, Ms. Wellman and Ms. Rickard provided the following comments regarding an interaction between Mr. Surlock and staff:

> During the observed medication administration pass, staff interacted pleasantly with Michael and Mr. Surlock, who remained at the house. Mr. Surlock asked staff a question about changing the amount of liquid the powdered substance, glutamine, is mixed with. Staff calmly answered that Mr. Surlock would have to address this question to Ms. Motyka, RN. As Mr. Surlock became more adamant to have his question answered, staff asked him to exit the building. He refused to leave. When staff called the State Troopers to report Mr. Surlock['s] non-cooperative stance, Mr. Surlock did relent, calmly said good-bye to Michael and left. This was a very intense situation as an observer. Staff did an excellent job of remaining calm and polite, and reminding Mr. Surlock that he needed to speak with Ms. Motyka.

*Id.* at 36. Again, Mr. Surlock's abusive and aggressive conduct was noted by non-party individuals.

Plaintiffs contend that the fact that the Administrative Defendants took these actions without hearing their side of the story supports their position that these actions were retaliatory in nature. Regardless, no reasonable juror could believe that the Administrative Defendants' actions were a pretext for retaliation. As discussed, the Administrative Defendants received a plethora of complaints regarding Mr. Surlock's abusive and inappropriate behavior from nearly all employees associated with Fravor Road. For example, in a February 18, 2010 email, Defendant Gleason recounted how Defendant O'Brien had to terminate a call from Mr. Surlock after he "refused to stop screaming into the phone, calling her names, and belittling her every attempt to have a reasonable conversation about the issues." Dkt. No. 383-1 at 25.

Plaintiffs rely on the Bradford Surlock's affidavit in response to Defendant Finster's motion for summary judgment, in which Mr. Surlock denies outright or attempts to explain some of the conduct on which the Administrative Defendants rely to support the imposition of the parameters and ultimate decision to preclude Mr. Surlock from entering the Fravor Road facility for three months. *See* Dkt. No. 371 at 60 (citing "BS Aff. in Finster" at ¶¶ 8, 10, 14). Specifically, Mr. Surlock contends that he "did not 'scream' at employees or use profanity towards them." Dkt. No. 390-3 at ¶ 8. The fact that Mr. Surlock yelled at employees is well documented throughout the record, and not only by the named Defendants. In fact, even Mrs. Surlock has admitted that Mr. Surlock raised his voice to staff members on occasion and made derogatory comments. *See, e.g.*, Dkt. No. 383-1 at 43 ("Yes, Brad did raise his voice to the staff person"); *id.* at 45 ("Yes, Brad did make a derogatory statement against Laurie and it was reported and yes he did admit to it and he was not right to say this").

Further, after a February 19, 2010 meeting with Mr. Surlock and two staff members to discuss his concerns regarding "flex" in the rear seat of the van where Michael sits, Fran Koon informed Defendant Gleason that when the staff explained to Mr. Surlock their rationale for staff positioning when riding in the van with Michael, he refused to listen and "became somewhat argumentative." Dkt. No. 383-2 at 1. Ms. Koon asked him to calm down, but Mr. Surlock refused. *See id.* At this point, Mr. Surlock "pulled out his tape recorder and repeated his refusal to allow us to transport Michael and asked that we acknowledge this on tape which we all did." *Id.* The email to Defendant Gleason further recounts that after Mr. Surlock left, Ms. Koon and Joyce Flynn continued discussing the possible use of an Uplander van instead of the Astro van that they were currently using. *See id.* Specifically, according to Ms. Koon,

> [t]he biggest advantage is that the middle seats are bucket seats and one could be removed to provide greater access by staff to Michael in the rear at the same time complying with Joyce's clinical recommendation. Also, the Uplander's rear seat does not flex like the current seat in the Astro. So Joyce is researching accommodations for both and she expects to have feedback by Monday. I do think that no matter what "stock" modifications we come up with we will need to address the headrest issue for the middle position of the back seat even though I believe Joyce may not see this as critical because of the neck brace Michael wears during transports.

*Id.* Despite Mr. Surlock's alleged disruptive and combative behavior, Ms. Koon and Ms. Flynn continued to discuss how best to ensure that Michael is kept safe during transport after Mr. Surlock's departure, and then conveyed these thoughts to Defendant Gleason. *See id.* Far from displaying retaliatory animus, these actions truly reflect that, regardless of how the Administrative Defendants may have felt about Mr. and Mrs. Surlock, they generally sought to provide Michael with the best care possible.

Further, Debby Rickard conducted a review of changes made at Fravor Road and made recommendations to improve consistent training for staff. *See* Dkt. No. 249-8 at 168-170. In her report dated September 13, 2010, Ms. Rickard made the following observation:

> What was extremely discouraging was the continued staff turnover at this home. Although administrative meetings continue with the Surlocks, disparaging and sometimes sexually explicit comments continue to be made to staff. Mr. Surlock has decreased some of his overbearing attitude toward staff but continues to intimidate anyone that he can. Staff continue to receive forceful direction from the parents about seating arrangements while transporting Michael and themselves, and comments about staff caring for other individuals in the home. From conversation with Monique [Dickerson] and the DA II, staff are so burnt out that they no longer report the ongoing staff abuses by the Surlocks. This results in staff bidding out of the house, new staff in need of training, and less consistent care.

*Id.* at 170.

Moreover, on March 23, 2010, Defendant O'Brien held a staff meeting to discuss concerns regarding Mr. Surlock's conduct after having received several complaints. After the meeting, she personally interviewed a number of employees who indicated that they were "the target of Mr. Surlock's aggression or sexual comments." Dkt. No. 250-55 at 1-9. The employees who reported such conduct to Defendant O'Brien during these interviews include the following: Sandra Coant, Debbie Kersey, Jeanette Maynes, Chelise Blauvelt, Cheryl Van Epps, Tonya Rodriguez, Wendy Goodberry, Cora Spencer, and Laura Wallace. *See id.* at 5-9. Common to all the reported incidents by these nine employees is that Mr. Surlock was repeatedly aggressive, made inappropriate sexual comments, and yelled at staff. *See id.* Notably absent from the record is any evidence refuting these repeated and persistent allegations of abuse, other than Mr. Surlock's vague and conclusory denials.

Further, to the extent that Plaintiffs claim that they were retaliated against when staff deliberately bleached or ruined Michael's laundry, the Court finds these conclusory allegations insufficient to support their position. Not only are such allegations insufficient on their face to support the claim, the allegations are further undermined by the fact that OPWDD reimbursed the Surlocks for any such lost or damaged clothing. *See* Dkt. No. 415-1 at ¶ 45; Dkt. No. 383-2 at 37. In fact, Defendant Alexander testified that staff brought to her attention that Michael's comforter had been inadvertently bleached in their attempt to wash it. *See* Dkt. No. 410-52 at 217-19. In response, Fravor Road purchased two new comforters for Michael to replace the one that had been inadvertently ruined. *See id.*

Throughout the record, one common theme is present: Bradford Surlock was repeatedly aggressive and inappropriate towards staff. These incidents were reported throughout Michael's time as a resident at Fravor Road, and often reported by individuals who are not named as Defendants in the present action. *See, e.g.*, Dkt. No. 250-68 at 6 (letter from Joseph Bertoli to OPWDD administration requesting that some action be taken to deal with Bradford Surlock's continued aggressive and hostile behavior towards staff and arguing that it is the "job of upper management to protect the employees"). As the undisputed facts establish, the written parameters that Mr. Surlock received made clear that, while he was free to raise concerns regarding Michael's treatment, they should not be directed at Fravor Road direct care staff or made while staff were "in the process of implementing a care plan or behavioral plan." These parameters and eventual denial of entry to the facility for three months were only implemented after years of outbursts and aggressive behavior towards staff. Tellingly, Mrs. Surlock raised continual complaints and strongly advocated on Michael's behalf during this entire period as well. The difference being that she did so in a manner that, while fervent, was not considered aggressive, abusive, or

inappropriate. As such, no reasonable juror could conclude that the imposition of the parameters and temporary ban was in retaliation for Mr. Surlock's advocacy on behalf of Michael. Accordingly, the Court finds that Plaintiffs have failed to establish that their speech was "a substantial motivating factor" in the Administrative Defendants' decision to take this adverse action against Mr. Surlock.

Based on the foregoing, the Court grants the Administrative Defendants' motion for summary judgment as to the First Amendment retaliation claim.

### 3. The Supervisory Defendants

Plaintiffs contend that the Supervisory Defendants were put on notice that other staff members were retaliating against them but failed to take adequate remedial measures. *See* Dkt. No. 371 at 61. Specifically, Plaintiffs assert that "[a]s early as June 2008, Mr. Surlock notified defendant Elliott that Fravor staff were unplugging Michael's radio and other sensory items and, thereby, depriving him of tools critical to his care and treatment. Plaintiffs notified Alexander and the other Supervisory Defendants about these deprivations as well." *Id.* According to Plaintiffs, "despite their knowledge that these devices were critical therapeutic tools, the deprivation of which caused Michael psychological injury and put him at risk of physical injury, these defendants failed to take adequate remedial measures to prevent this from happening." *Id.* Moreover, Plaintiffs contend that, "as house directors and assistant house director, Reid, LeBoeuf and Perkins oversaw the daily activities [at] the house and, as such, were well aware of, and contributed to, Michael's exclusion from house activities vis-a-vis leaving him out of house photos and refusing to celebrate his birthday or other holidays while other residents enjoyed such attention. As Mary-Anne explained, this rendering of Michael as an outcast increased his

frustration and anxiety, which caused him psychological harm and increased his risk of physical harm through SIBs." *Id.* (citing MAS Aff. in Supervisors ¶ 39).

Plaintiffs allege that a reasonable jury could conclude that the Supervisory Defendants "failed to prevent and, in some case[s] directly partook in, these adverse actions because of their disdain for the Surlocks' criticism of them and persistent advocacy for Michael's care." *Id.* Plaintiffs argue that, "[i]ndeed, Maynes told the Surlocks that Alexander did not like them and even threatened to withhold her pay raise if she was found talking to them." *Id.* (citing Ex. M-69 p.4). Further, Plaintiffs claim that "Reid once admitted to the Surlocks that 'staff hold grudges' and Perkins told them to 'be careful what you say because it gets back to Barb [Alexander] and Laurie [Elliott]." *Id.* at 61-62 (citing Exs. M-73-74 p.2). In response to the Supervisory Defendants' arguments that they were not personally involved, Plaintiffs argue that "these defendants' personal involvement is established by their deliberate indifference to known acts of retaliation by the very staff over which they exercise supervisory responsibility, as well as by their allowance of the continuation of a policy and practice of such retaliatory acts, which continued unabated on scores of occasions over the years, and, in some cases, such as ostracizing Michael from house activities, by their very own direct participation." *Id.* at 62.[22]

Again, despite the sheer volume of their opposition to the pending motions, Plaintiffs have failed to support their First Amendment retaliation claims against the Supervisory Defendants with "specific and detailed factual allegations," rather than generic and conclusory assertions. *See*

---

[22] In their motion for summary judgment, the Supervisory Defendants argue that the Court should dismiss any retaliation claims against them regarding the decision to restrict Bradford Surlock from entering Fravor Road. *See* Dkt. No. 250-77 at 30-33. Plaintiffs, however, have not responded to this argument and, therefore, the Court deems this claim abandoned as to the Supervisory Defendants.

*Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000). Plaintiffs conclusory allegations fail to establish the personal involvement of the Supervisory Defendants, or even that the alleged retaliatory acts are causally related to any alleged protected activity.

Moreover, Plaintiffs have failed to establish that their speech was effectively chilled as a result of the alleged retaliatory conduct or that they suffered some other concrete harm sufficient to support this claim. Plaintiffs' speculative and conclusory allegations as to non-speech related harm have been repeatedly found to be insufficient to support a First Amendment retaliation claim. *See Dorsett*, 732 F.3d at 161 (finding that delay in approving a settlement did not "constitute[ ] a concrete injury giving Plaintiffs standing"). As discussed, various non-speech related harms are sufficient to give a plaintiff standing to support a First Amendment retaliation claim. *See Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); *Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (additional scrutiny at border crossing); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (revoking a building permit); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (refusal to enforce zoning laws). Plaintiffs contend that they experienced "extreme frustration" from alleged retaliatory conduct, such as having to untie several knots in Michael's shoelaces, and that they suffered "emotional distress" as a result of Michael's comforter being bleached. *See* Dkt. No. 394-1 at ¶¶ 346-351. While the Court can appreciate how difficult it can be to untie shoelaces tied with several knots, the "extreme frustration" the Surlocks experienced is simply not the type of non-speech related harm that has been found to be sufficient to support a First Amendment retaliation claim.

Further, Plaintiffs are correct that the sensory items were part of Michael's treatment plan. Plaintiffs fail to provide any evidence, other than Mrs. Surlock's own conclusory assertions,

establishing that Michael was harmed through these alleged deprivations. Significantly, Plaintiffs fail to provide the Court a single example of how he was psychologically harmed through these alleged deprivations, or even that he experienced an episode of SIB when he sought out but was unable to find or use one of his sensory items. *See, e.g.*, Dkt. No. 394-1 at ¶¶ 355-57.

Finally, Plaintiffs admit that the Supervisory Defendants did not personally unplug, turn off, or change the station on Michael's clock radio, or otherwise deprive Michael of his sensory devices. *See* Dkt. No. 394-1 at ¶ 372. Rather, they contend that other staff at Fravor Road engaged in this behavior. *See id.* at ¶¶ 371, 374. Plaintiffs admit that the Supervisory Defendants directed all Fravor Road staff to plug in Michael's sensory devices and to not unplug them without authorization from a supervisor. *See id.* at ¶ 378. Further, the Supervisory Defendants directed all staff not to cover any of Michael's possessions in response to the Surlocks' complaints. *See id.* Although it is alleged that staff continued engaging in this behavior, the Supervisory Defendants responded to the complaints in a reasonable manner and were not personally involved in the alleged retaliatory conduct. Further, it is unclear what other steps the Supervisory Defendants could have taken in response to these complaints, considering the fact that it was unknown who had actually engaged in the alleged retaliatory conduct.

Based on the foregoing, the Court grants the Supervisory Defendants' motion for summary judgment as to Plaintiffs' First Amendment retaliation claim.

## I.      Negligent supervision

Under New York law, a plaintiff must establish three elements to prevail on a negligence claim: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty; and (3) as a result of the breach, the plaintiff suffered damages. *See Pasternack v. Lab.*

*Corp. of Am.*, 892 F. Supp. 2d 540, 546-47 (S.D.N.Y. 2012) (citing *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008)).  A claim for negligent hiring, supervision, or retention, "in addition to the standard elements of negligence," requires "a plaintiff [to] show: (1) that the tortfeasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.'" *Ehrens v. Lutheran Church*, 38 F.3d 232, 235 (2d Cir. 2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 229 A.D.2d 159, 161 (2d Dep't 1997)).  "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of the facts that would lead a reasonably prudent person to investigate that prospective employee." *Richardson v. City of N.Y.*, No. 04-CV-5314, 2006 WL 3771115, *13 (S.D.N.Y. Dec. 21, 2006) (internal quotation and alteration omitted).

### *1. Defendant Graham*

It is unclear to the Court why Defendant Graham was included in this claim and, despite Plaintiffs' arguments in their opposition that Defendant Graham was a "supervisor" at Fravor Road and that she should be included in this claim, they failed to put forth any evidence in support of this claim.  In fact, the only allegations that could possibly apply to Defendant Graham in regards to this claim are that, while Defendant Graham served as Assistant House Director from January through July of 2008, "house staff were responsible for four medication administration failures . . . and two reported incidents of staff abuse and/or neglect of Michael, . . . who was admitted on two occasions to the emergency room."  Dkt. No. 393-1 at ¶ 3.  As

discussed in greater detail above, however, nothing in the record indicates that Defendant Graham

was even present at the Fravor Road facility when these alleged incidents occurred.

Moreover, during Defendant Graham's time at Fravor Road, she served as a Development

Assistant 1 trainee. *See* Dkt. No. 258-30 at 2. According to Defendant Graham's job description,

she was responsible for, among other things, the following supervisory duties:

> -Supervises Developmental Aides and Developmental Aide
> Trainees (and others as appropriate) in the care, treatment and
> habilitation of developmentally disabled individuals.
>
> -Schedules and assigns staff to specific activities in order to provide
> the most efficient and effective services.
>
> -Maintains and posts scheduled assignments and adjusts such
> assignments as required based on availability of staff, the abilities
> of specific staff members and the particular requirements of the
> developmentally disabled individual involved.
>
> -Instructs staff as to the specific tasks to be performed and provides
> them with appropriate written guidelines if necessary.
>
> -Personally observes staff carry out assignments to ensure that
> instructions/guidelines are being adhered to.
>
> -Periodically meets with staff individually or as a group to discuss
> observations, deficiencies, new techniques, administrative matters
> or other circumstances that might have a bearing on the effective
> and efficient functioning of the staff.
>
> -Meets with staff on an individual basis to discuss job performance
> strengths and weaknesses, suggestions for improvement, and
> follows up as appropriate.
>
> -Maintains appropriate records of staff relating to time, attendance,
> level of performance, specific deficiencies, counseling sessions,
> training needs, etc.
>
> -Supervises staff in appropriate reactions to emergency or crisis
> situations.

-Manages or supervises the management of consumers funds and related records.

\* \* \* \* \*

-As needed, performs the duties/activities of the Developmental Aide/Trainee.

Dkt. No. 258-30 at 7.  As Defendant Graham points out, the evidence in this case make clear that she was not responsible for the distribution of Michael's medication, nor was she responsible for the policies regarding the use of body charts or medical notes to document Michael's injuries. Defendant Graham's job description makes clear that her responsibilities were almost entirely administrative and not directly related to any medical care of the residents at Fravor Road.

Based on the foregoing, the Court grants Defendant Graham's motion for summary judgment as to Plaintiffs' negligent supervision cause of action.

### 2. The Administrative Defendants

Plaintiffs contend that the Administrative Defendants "were made aware on numerous occasions that Fravor Road staff were improperly administering Michael's medications, failing to apply Michael's wrist splint as prescribed and depriving Michael of needed sensory devices; however, they failed to take adequate steps to address these issues, which continued unabated over the years." Dkt. No. 371 at 71.  Further, Plaintiffs claim that, "[i]n addition, these defendants' failure to supervise created a reasonably foreseeable risk of danger to Michael. Specifically, by failing to provide Michael with one-to-one care, these defendants left Michael insufficiently supervised, which led to an increased risk, and occurrence, of SIBs, abuse, neglect and physical and psychological injury." *Id.*  Moreover, Plaintiffs contend that the Administrative Defendants were put on notice of their employees' propensity to engage in tortious conduct

because they were "put on notice various times throughout the year of the inadequate treatment and improper conduct by Michael's care takers, and so these defendants were well aware of the risk of harm to Michael." *Id.* at 73. Plaintiffs also argue that "these defendants' failure to ensure an adequate level of supervision for Michael created a reasonably foreseeable risk of danger, as evidence[d] by, inter alia, the pleas to these defendants for such care by Michael's parents, Medicaid Service Coordinators and CQC over the years." *Id.*

Plaintiffs' claim of negligent supervision against the Administrative Defendants is entirely conclusory, unsupported by any citation to evidence in the record. Plaintiffs have failed to put forth any evidence establishing that the Administrative Defendants knew or should have known that any of the employees at Fravor Road had a propensity for tortious conduct, prior to any such alleged wrongdoing. *See Valenti v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 330 (S.D.N.Y. 2011). Moreover, Plaintiffs have failed to even identify the individual employees upon whom the Administrative Defendants' derivative liability would be predicated. *See id.* Further, Plaintiffs have failed to put forth any evidence that the Administrative Defendants had any personal involvement in the hiring or training of any staff before they came to work at Fravor Road. Moreover, Plaintiffs failed to put forth any evidence demonstrating that any of the staff hired to work at Fravor Road had a prior record of having engaged in or had a propensity for abusive or negligent conduct or that the Administrative Defendants were aware of any such conduct. Finally, as discussed above, the undisputed facts demonstrate that the reports of abuse or neglect by employees resulted in immediate action, *i.e.*, the charged employee was removed from the residence pending investigation.

Based on the foregoing, the Court grants the Administrative Defendants' motion for summary judgment as to Plaintiffs' negligent supervision claim.

### *3. The Supervisory Defendants*

Plaintiffs contend that the "record contains sufficient evidence from which a reasonable jury could find that the Supervisory Defendants, and each of them, breached their duty of care in supervising, training and retaining staff at Fravor Road, thereby causing Michael injury." Dkt. No. 371 at 70-73. Specifically, Plaintiffs argue that the Supervisory Defendants "were made aware on numerous occasions that Fravor Road staff were improperly administering Michael's medications, failing to apply Michael's wrist splint as prescribed and depriving Michael of needed sensory devices; however, they failed to take adequate steps to address these issues, which continued unabated over the years." *Id.* at 71. Additionally, Plaintiffs assert that the Supervisory Defendants' "failure to supervise created a reasonably foreseeable risk of danger to Michael. Specifically, by failing to provide Michael with one-to-one care, these defendants left Michael insufficiently supervised, which let to an increased risk, and occurrence, of SIBs, abuse, neglect and physical and psychological injury." *Id.*[23]

As with their claim against the Administrative Defendants, Plaintiffs' claim of negligent supervision against the Supervisory Defendants is entirely conclusory and unsupported by any citation to evidence in the record. Plaintiffs have failed to put forth any evidence establishing that the Supervisory Defendants knew or should have known that any of the employees at Fravor Road had a propensity for tortious conduct, prior to any such alleged wrongdoing. *See Valenti*, 837 F. Supp. 2d at 330. Moreover, Plaintiffs have failed to even identify the individual employees upon whom the Supervisory Defendants' derivative liability would be predicated. *See id.* Further, as discussed in more detail above, the undisputed facts demonstrate that, when

---

[23] Again, notably absent from these allegations are any citation to the record or even a reference to a specific incident.

allegations of wrongdoing were brought to the Supervisory Defendants' attention, they took prompt action to ensure that such conduct would not occur again. Aside from conclusory allegations, Plaintiffs have failed to put forth any evidence demonstrating how a specific breach by the Supervisory Defendants caused any injury to Michael. Rather, they simply argue that, had Michael been provided one-to-one supervision, he would have suffered fewer SIBs and fewer injuries. Again, however, they failed to cite to a single incident in which they believe that one-to-one supervision would have remedied any such unspecified injury. Finally, as discussed above, the Supervisory Defendants did not have the authority to provide Michael with one-to-one supervision.

Based on the foregoing, the Court grants the Supervisory Defendants' motion for summary judgment as to Plaintiffs' negligent supervision claim.

**J.     Medical malpractice[24]**

The Nurse Defendants contend that most of Plaintiffs' allegations against them relate to claims that Michael's medications were not properly administered, were not administered with thickened fluid, or were not administered at all. *See* Dkt. No. 253-4 at 26-27. Even accepting the allegations as true, the Nurse Defendants claim that there is no evidence that the medication errors resulted in harm to Michael. *See id.* at 27. The Nurse Defendants argue that "Plaintiffs have not identified any actual injuries as a result of the medication errors and have no[t] disclosed

---

[24] In their memorandum of law, the Nurse Defendants argue that the Court should construe this claim against them as a medical malpractice claim and not as a general negligence claim. *See* Dkt. No. 253-4 at 25. In their response, Plaintiffs have only argued in support of a medical malpractice claim against the Nurse Defendants. *See* Dkt. No. 371 at 73-75. As such, the Court finds that Plaintiffs have abandoned any general negligence claim against the Nurse Defendants and will only address the merits of the medical malpractice claim.

a medical expert witness who will (1) identify actual injuries and (2) link those injuries to the Nurses' conduct." *Id.* Unlike Plaintiffs, the Nurse Defendants claim that they have retained nursing and pharmacology experts who have "given opinion that there are no documented injuries as a result of the medication errors, and further, the errors as alleged would not be expected to cause injury." *Id.* In response to the Nurse Defendants causation arguments, Plaintiffs contend as follows: "As to causation, Motyka and Dickerson both testified to the potential negative effects of medication errors on Michael and the Surlocks recount in their journals and aver in their affidavits that they saw some of these effects, such as increased lethargy, befall Michael in the wake of medication errors." Dkt. No. 371 at 75 (citing Motyka Dep. Tr. pp. 54-54 (M-71) and Dickerson Dep. Tr. p. 39 (M-72)).

"The elements of a cause of action to recover damages for medical malpractice include a deviation or departure from the accepted standard of care and evidence that the deviation or departure was a proximate cause of injury or damage." *Feuer v. Ng*, 136 A.D.3d 704, 706 (2d Dep't 2016) (citations omitted). "To prevail on a motion for summary judgment in a medical malpractice action, the defendant must 'make a prima facie showing either that there was no departure from accepted medical practice, or that any departure was not a proximate cause of the patient's injuries.'" *Id.* (quotation omitted). "In response, the plaintiff need only raise a triable issue of fact regarding 'the element or elements on which the defendant has made its prima facie showing.'" *Id.* (quotation and other citation omitted).

In the present matter, the Court finds that the Nurse Defendants have made a prima facie showing that, even assuming their was a departure from the accepted standard of care, such departure was not was not a proximate cause of any injury. Again, Plaintiffs' response focuses entirely on the alleged medication errors. As discussed in relation to the substantive due process

113

allegations against the Nurse Defendants, Dr. Nichita reviewed the medical record in this matter and determined that, with the exception of a slight upset stomach in one instance, no adverse effects/injuries were caused as a result of the medication errors. *See* Dkt. No. 252-5. Dr. Nichita discusses the uses of each drug at issue, the pharmacokinetics of the drugs, her opinion as to why the alleged errors would not have caused any adverse effects, and the fact that the record is devoid of any alleged injuries as a result of the errors. *See id.* Dr. Nichita is Board Certified in forensic psychiatry by the American Board of Psychiatry and Neurology and is currently licensed to practice in New York. *See* Dkt. No. 252-4. The Nurse Defendants have satisfied their prima facie burden.

In response to Dr. Nichita's determination that Michael did not suffer any injury as the result of any alleged medication error, Plaintiffs rely on the observations of Mr. and Mrs. Surlock and the statements of Defendants Motyka and Dickerson. First, Plaintiffs reliance on the statements of Defendants Motyka and Dickerson is entirely misplaced and insufficient to rebut the Nurse Defendants' prima facie case. As Plaintiffs admit, Defendants Motyka and Dickerson testified about the "**potential** negative effects of medication errors." Specifically, Defendant Motyka testified as follows:

> Q. But assuming the Geodon and/or the Lamictal were used for anti-seizures, if he was not given dosages, that could have increased the tendency to have seizures?
>
> A. It could.

Dkt. No. 376-26 at 1. Similarly, Defendant Dickerson such an error "could lead to a seizure." Dkt. No. 376-27 at 1-2. The fact that Michael could have been potentially harmed through medication errors is not at issue. What is at issue is whether he was, in fact, harmed by such medication errors. Plaintiffs have offered nothing but their own conclusory allegations that

Michael suffered any such injury, which is patently insufficient to rebut the Nurse Defendants' prima facie case. Finally, Mr. and Mrs. Surlock's conclusory allegations that the medication errors had an impact on Michael is insufficient to rebut the Nurse Defendants' prima facie case. Without question, the physiological impact of different medications and the impact that a missed or improper dose may have on a person is not something within the ordinary experience or knowledge of lay persons. Without such expert testimony, Plaintiffs have failed to rebut the Nurse Defendants' prima facie case. *See Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987) ("[E]ven where negligence is easily within the layman's realm of knowledge and hence properly provable without expert testimony, expert testimony may be required to prove that the negligence was the proximate cause of the injury complained of, for '[a]lmost every person who receives the services of a physician is sick or disabled when he first goes to the physician. Thus there lurks the ever present possibility that it was the patient's original affliction rather than the physician's negligence which caused the ultimate damage'") (quotation and other citation omitted); *Hall v. County of Saratoga*, No. 1:10-cv-1120, 2013 WL 838284, *12 (N.D.N.Y. Mar. 6, 2013) ("Whether the claim is grounded in negligence or medical malpractice, '[w]here medical issues are not within the ordinary experience and knowledge of lay persons, expert medical testimony is a required element of a prima facie case'") (quoting *Myers v. State of New York*, 46 A.D.3d 1030, 1031 (3d Dep't 2007)) (other citations omitted).

Accordingly, the Court grants the Nurse Defendants' motion for summary judgment as to Plaintiffs' medical malpractice claim.

**K.      Qualified immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . . That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could

disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." *Id.* (citation omitted). "However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

### 2. Defendant Finster

In the alternative, the Court finds that Defendant Finster is entitled to qualified immunity as to Plaintiffs' substantive due process claim. As discussed above, Plaintiffs contend that

Defendant Finster "pushed" Michael out of his room and, during another incident, "slapped" Michael while he was on his bed. A review of the video capturing these incidents makes clear that Plaintiffs have grossly exaggerated the alleged incidents. The video clearly shows Defendant Finster guiding Michael out of his room by placing her hand on his back. Nothing in the video depicts conduct that could be considered abusive. As to the alleged "slapping" incident, again Plaintiffs grossly misrepresented the alleged incident. As set forth more fully above, the video depicts Defendant Finster gently assisting Michael with his clothes and then gently lowering her hand towards Michael. No reasonable fact finder could conclude that Defendant Finster "slapped" Michael as alleged.

Based on the foregoing, the Court finds that, in the alternative, Defendant Finster is entitled to qualified immunity as to Plaintiffs' substantive due process claim.

### 3. Defendant Maynes

Defendant Maynes argues that she is entitled to qualified immunity because a reasonable person would not have believed her conduct violated clearly established rights. *See* Dkt. No. 242-1 at 34-35. Specifically, she contends that "an objectively reasonable defendant would not believe Defendant Maynes' alleged failure to report Defendant Graham-Webber, two medication errors, two failures to put Michael's wrist splints on, and one allegation of abuse violated any clearly established rights." *Id.* at 35.

The Court finds it unnecessary to spend much time on this argument, having already decided that a reasonable jury could conclude that Defendant Maynes violated Michael's constitutional rights to be free from excessive force and physical, psychological, and emotional

harm, rights which have been clearly established for some time. *See Youngberg*, 457 U.S. at 324; *see also West*, 2008 WL 4201130, at *19.

Accordingly, Defendant Maynes' motion for summary judgment on qualified immunity grounds is denied.

### 4. Defendant Spencer

For the reasons set forth in the Court's discussion of the substantive due process claim against Defendant Spencer, questions of fact preclude the Court from finding that she is entitled to summary judgment as to that claim.

As to Plaintiffs' First Amendment retaliation claim, however, the Court finds that, in the alternative, Defendant Spencer is entitled to qualified immunity because the law was not clearly established. Specifically, as discussed, the right to monitor and record public officials' conduct in public locations is clearly established in various situations. *See Glik v. Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011) (discussing the various situations in which the right to videotape public officials is clearly established). The Court, however, is not aware of any authority setting forth the proposition that the First Amendment protects a parent's right to engage in unauthorized video surveillance of staff and his child in the bedroom of a state-operated facility. As such, to the extent that this surreptitious monitoring could be considered a protected activity, it was not clearly established. *See* Katherine Anne Meier, *Removing the Menacing Specter of Elder Abuse in Nursing Homes Through Video Surveillance*, 50 GONZ. L. REV. 29, 34 (2014) (discussing the fact that the installation of cameras in nursing homes and other like facilities and the privacy implications it presents are an emerging area of law).

Based on the foregoing, the Court finds that, in the alternative, Defendant Spencer is entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claim.

### 5. The Administrative Defendants

#### i. Substantive Due Process

As discussed above, most of Plaintiffs' allegations as to their substantive due process claims center around their disagreements with the treatment decisions made. These decisions were made after spending considerable time consulting experts in all fields. Further, the refusal to grant some of Bradford and Mary-Anne's requests for changes in Michael's treatment were similarly made after substantial deliberation and consultation, and were often made because of the fact that Michael was showing improvement with his current course of treatment. No reasonably objective official would believe that such conduct violated Michael's substantive due process rights.

Further, as discussed, the Administrative Defendants spent an extraordinary amount of time overseeing the Fravor Road facility and, in particular, the care that Michael was receiving. When complaints were brought to their attention, they were investigated and, when necessary, remedial action was taken. Such actions included re-training employees, reassigning employees to different facilities, and terminating/placing employees on leave. Moreover, the Administrative Defendants personally handled a multitude of Mr. and Mrs. Surlocks' complaints and repeatedly met with them in an effort to ensure that Michael was receiving the treatment he deserved. No reasonably objective official would believe that such attentive oversight violated Michael's substantive due process rights.

Accordingly, in the alternative, the Court finds that the Administrative Defendants are entitled to qualified immunity on Plaintiffs' substantive due process claims.

### ii. Procedural due process

Even had the Court found that questions of fact precluded the Court from granting Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander's motion for summary judgment as to this claim, the Court finds that they are entitled to qualified immunity. It is hardly "clearly established" that the operators of a state-run home for those with mental disabilities violate a parent's due process rights when they prevent the parent from entering the home because of several alleged incidents of misconduct but still afford the parent unlimited access to his child outside of the home. Further, Defendants Gleason, O'Brien, DiNuzzo, Elliott and Alexander made this decision after first implementing parameters to guide Mr. Surlock's interactions with employees. Those parameters were drafted and provided after Defendants consulted with legal counsel who advised that Mr. Surlock should be put on notice that his failure to comply could result in limitations on his visitation rights at Fravor Road. The three-month ban was also imposed only after Defendants consulted with legal counsel. Accordingly, even if the law was clearly established, an objectively reasonable official would not believe that such conduct violated Bradford Surlock's clearly established rights.

Based on the foregoing, the Court finds that the Administrative Defendants are entitled to qualified immunity as to Plaintiffs' procedural due process claim.

### iii. First Amendment Retaliation

As discussed above, the Administrative Defendants implemented the parameters for Mr. Surlock and eventually temporarily banned him after years of complaints from staff regarding his aggressive and abusive behavior. In fact, the Administrative Defendants were often subject to that same behavior. During the years that Michael was housed at Fravor Road, his parents continuously complained about the care that he was receiving and advocated on his behalf. More than two years after Michael first moved into Fravor Road, the Administrative Defendants finally implemented parameters governing Mr. Surlock's conduct. While Mrs. Surlock advocated on behalf of Michael and complained about his treatment during this entire time, staff did not raise complaints of verbal abuse, or aggressive or inappropriate conduct against her, only Mr. Surlock. In light of the repeated complaints the Administrative Defendants received from staff regarding Mr. Surlock's conduct and in light of the deliberation in which they engaged before imposing the parameters and eventual temporary ban, which included consulting with counsel, no objectively reasonable official would believe that such conduct was in retaliation for Plaintiffs' protected activity. *See Contes v. Porr*, 345 F. Supp. 2d 372, 381 (S.D.N.Y. 2004) (holding that the city's corporate counsel was entitled to qualified immunity in action alleging that firefighters' First Amendment rights were violated when disciplinary charges were initiated against them in retaliation for their political affiliation where counsel conducted an investigation after having received complaints of harassment by female firefighters) (citation omitted). In fact, Plaintiff Bradford Surlock was still permitted to raise complaints regarding Michael's treatment, now simply with parameters as to how such complaints should be raised. Moreover, Mrs. Surlock, who advocated on behalf of Michael just as ardently, had no such parameters governing her conduct.

Accordingly, the Court finds that, in the alternative, the Administrative Defendants are entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claim.

### 6. The Nurse Defendants

Contrary to Plaintiffs' contentions, the Nurse Defendants are, in the alternative, entitled to qualified immunity as to the substantive due process claim. As discussed in more detail above, when medication errors were discovered, the Nurse Defendants took remedial action to try to ensure that the same mistake would not happen again. These actions included discussing the issue with the direct care staff, retraining the direct care staff, altering policies to ensure that changes in medication are more effectively disseminated, and occasionally revoking a direct care worker's medication certification. Moreover, the Nurse Defendants reinforced the policy that, when a medication error occurred, the prescribing physician would be contacted to receive directions on any actions that should be taken.

The undisputed facts make clear that no reasonably objective official in the Nurse Defendants' position would believe that their actions or omissions violated Michael's clearly established rights. This result is further supported by the fact that Michael was taking an extraordinary number of prescription medications and supplements during his time at Fravor Road. These prescriptions and supplements were constantly changing, and many of the alleged mistakes occurred immediately following a change in prescription. Accordingly, the Court finds that, in the alternative, the Nurse Defendants are entitled to qualified immunity as to Plaintiffs' substantive due process claim.

### 7. Supervisory Defendants

### i. Substantive due process

As discussed in more detail above, the Supervisory Defendants tirelessly worked to ensure that Michael received quality care. These efforts included a considerable amount of time trying to appease Michael's parents. The undisputed facts establish that an objectively reasonable official in the Supervisory Defendants' positions would not believe that his conduct violated Michael's substantive due process rights.

Accordingly, the Court finds that, in the alternative, the Supervisory Defendants are entitled to qualified immunity as to Plaintiffs' substantive due process claim.

### ii. First Amendment retaliation

As discussed above, in response to the Surlocks' complaints, the Supervisory Defendants directed staff to cease all alleged retaliatory conduct. Considering that the complaints failed to specify the staff members who had actually engaged in the conduct, the Supervisory Defendants' response was reasonable. Further, given the nature of the complaints, which generally consisted of allegations that staff members were giving the Surlocks the silent treatment and that Michael's sensory devices were being unplugged, no objectively reasonable official in the Supervisory Defendants' position would believe that they were violating Plaintiffs' clearly established rights.

Based on the foregoing, the Court finds that, in the alternative, the Supervisory Defendants are entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claim.

### K. Defendants Finster and Spencer's motions to bifurcate

In the event that their motions for summary judgment are denied, Defendants Finster and Spencer ask the Court to sever the claims against them under Rule 21 of the Federal Rules of Civil Procedure.[25]  *See* Dkt. No. 261 at 34.  Alternatively, Defendant Spencer requests that the Court order a bifurcated trial for the claims against her in accordance with Rule 42.  *See id.* at 34-35.

Rule 21 governs "misjoinder and nonjoinder of parties" and provides, in part, that "[a]ny claim against a party may be severed and proceeded with separately."  Fed. R. Civ. P. 21.  Rule 42(b) states, in part, that "[t]he Court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim."  Severance under Rule 21 results in entirely independent actions being tried, and two independent judgments.  By contrast, separate trials under Rule 42 usually will result in one judgment.  *See* 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2387.

The Court has broad discretion to sever claims under Rule 21 or to grant separate trials under Rule 42, and the Court will consider the same factors under both Rules.  *See, e.g.*, *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988); *Corporan v. City of Binghamton*, No. 05-CV-1340, 2006 WL 2970495, *2 n.2 (N.D.N.Y. Oct. 16, 2006); *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 549 (S.D.N.Y. 2005).  The factors for the Court to consider are (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether

---

[25] Since the Court has granted Defendant Finster's motion for summary judgment, her request is denied as moot.

prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *See Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999).

In the present matter, the Court finds that neither severance nor separate trials is warranted. There is substantial overlap in the witnesses, parties and evidence relating to all of the remaining claims. Further, the convenience of the witnesses and the parties argues strongly for a single trial and against severance or separate trials.

Defendant Spencer's primary argument in favor of severance or separate trials is that because of the number of named Defendants and because she was not personally involved in much of the alleged misconduct, she will be prejudiced. *See* Dkt. No. 261 at 36. As a result of Plaintiffs' voluntary withdrawal of several claims and because the Court has now dismissed a majority of Plaintiffs' claims, any prejudice Defendant Spencer would have suffered is significantly diminished. Further, the jury will be instructed regarding personal involvement, which will further mitigate any such prejudice.

Based on the foregoing, the Court denies Defendant Spencer's motion for severance or separate trials.


## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the following claims are dismissed pursuant to Plaintiffs' voluntary withdrawal: (1) all claims against Defendant Jasiewicz; (2) the First Amendment claims against Defendants Graham, Dickerson, Reynolds, Motyka, Maynes and Finster; (3) the intimate

association claim against all Defendants; and (4) the procedural due process claim against Defendants LeBoeuf, Reid, Perkins and Graham; and the Court further

**ORDERS** that Defendant Graham's motion for summary judgment (Dkt. No. 258) is **GRANTED in its entirety** and she is dismissed from this action; and the Court further

**ORDERS** that Defendant Finster's motion for summary judgment (Dkt. No. 238) is **GRANTED in its entirety** and she is dismissed from this action; and the Court further

**ORDERS** that Defendant Maynes' motion for summary judgment (Dkt. No. 242) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Defendant Maynes' motion for summary judgment is granted only as it applies to the alleged medication errors, wrist splint application, and failure to report as discussed above; and the Court further

**ORDERS** that Defendant Spencer's motion for summary judgment (Dkt. No. 251) is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendant Spencer's motion for summary judgment is denied only as to the substantive due process claim relating to the laundry basket incident and alleged abusive language, and as to the motion for severance or to bifurcate; and the Court further

**ORDERS** that Defendants Elliott, Alexander, Reid, LeBoeuf, and Perkins' motion for summary judgment (Dkt. No. 250) is **GRANTED in its entirety** and they are dismissed from this action; and the Court further

**ORDERS** that Defendants Dickerson, Motyka, and Reynolds' motion for summary judgment (Dkt. No. 253) is **GRANTED in its entirety** and they are dismissed from this action; and the Court further

**ORDERS** that Defendants Gleason, O'Brien and DiNuzzo's motion for summary judgment (Dkt. No. 249) is **GRANTED in its entirety** and they are dismissed from this action;[26] and the Court further

**ORDERS** that the following claims and Defendants remain in this action: (1) all claims against Defendant Hillard; (2) the claim for prospective injunctive relief against Defendant Delaney; (3) the substantive due process claim against Defendant Maynes as to the March 25, 2011 incident; and (4) the substantive due process claim against Defendant Spencer as to the alleged abusive language and laundry basket incident; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 8, 2016
     Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[26] As noted, the Administrative Defendants' motion for summary judgment did not address Defendant Kerry Delaney and Plaintiffs indicate that they wish to "continue all of their Section 1983 claims for prospective injunctive relief against [her] in her official capacity as OPWDD Commissioner[.]" Dkt. No. 371 at 3 n.5. It is unclear from the amended complaint what injunctive relief Plaintiffs believe that they are entitled to, especially since Michael no longer resides at Fravor Road. Without the benefit of the parties' guidance, however, Defendant Delaney shall remain in this action in her official capacity.